**Jose RIVERA, Plaintiff,**

v.

**Richard S. SCHWEIKER, Secretary of Health and Human Services, Defendant.**

**No. 79 Civ. 6333–CSH.**

United States District Court, S.D. New York.

Sept. 20, 1982.

David Goldfarb, Legal Aid Society, New York City, for plaintiff.

William M. Tendy, Asst. U.S. Atty., New York City, for Schweiker.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Plaintiff Jose Rivera brought this action pursuant to §§ 205(g) and 1631(c)(3) of the Social Security Act, as amended (the "Act"), 42 U.S.C. §§ 405(g) and 1383(c)(3), for review of a final determination of the Secretary of Health and Human Services (the "Secretary"), which denied plaintiff's applications for disability insurance benefits and Supplemental Security Income ("SSI"). Plaintiff moves pursuant to Rule 12(c), F.R. Civ.P., for judgment on the pleadings. Defendant cross-moves pursuant to Rule 12(c), for affirmance of the Secretary's decision and a dismissal of the complaint. Since matters outside the pleadings have been presented, specifically the transcript ("Tr.") of certain of the proceedings below, I treat this motion as one for summary judgment pursuant to Rule 56, F.R.Civ.P., see *Crespo v. Harris,* 484 F.Supp. 1167 (S.D.N.Y.1980). For the reasons stated, summary judgment is granted for plaintiff, and defendant's motion is denied.

## PROCEDURAL HISTORY

On December 6, 1977 plaintiff filed an application for disability insurance benefits and SSI, alleging that he was disabled due to an "emotional disorder" and an ulcer (Tr. 85). On February 20, 1978 the Secretary denied his applications, finding that plaintiff had not established his disability. On March 17, 1978 Rivera filed a request for reconsideration of the Secretary's denial of benefits. Upon reconsideration, the Secretary affirmed the denial of benefits (Tr. 92, 100–104). Rivera subsequently requested a hearing with the Secretary's Bureau of Hearings and Appeals (Tr. 29) which was held on October 11, 1978 before an Administrative Law Judge ("ALJ"). Plaintiff, who was represented by counsel, testified as to how his background, his medical history and his physical and mental condition rendered him unable to work. The only other witness at the hearing was a vocational expert, William Mooney (Tr. 220).

On April 11, 1979, the ALJ denied plaintiff's application for disability insurance benefits and SSI upon finding that he was not disabled within the meaning of the Act. Rivera's request to the Secretary's Appeals Council to review this decision (Tr. 6) was denied on July 5, 1979 (Tr. 5). The decision of the ALJ thus became the final decision of the Secretary and is reviewable by this Court under 42 U.S.C. §§ 405(g), 1383(c)(3).

## BACKGROUND

Plaintiff is a 46 year old male who came to the United States from Puerto Rico in 1950 (Tr. 13, 36). While his proficiency in the English language is considerable and expanding (Tr. 39), Rivera's formal education ended at the third grade. He has never enrolled in any specialized training courses (Tr. 13, 39).

Rivera's employment history consists of unskilled or semi-skilled jobs which lasted from a few months to two years (Tr. 41). These positions required either an ability to operate a machine or the physical capacity to do heavy lifting (Tr. 39–43, 66, 67). Claimant was last employed in 1967 as a machine operator in a handbag factory (Tr. 39).

Plaintiff claims that the onset of a nervous breakdown in 1967 caused him to cease working. His continuing psychological problems have caused him to separate from his wife (Tr. 37–38) and four children (Tr. 96–98).

Plaintiff started treatment for his alleged emotional disorder at Bronx State Hospital in 1967. He subsequently sought psychiatric care in January 1968 at Bellevue Psychiatric Hospital ("Bellevue") (Tr. 233). The Administrator of Psychiatry found plaintiff to be "extremely agitated and tremulous, incoherent and in a panic." The medical abstract states that, according to his family, plaintiff was neither violent nor assaultive. He appeared to be experiencing "paranoid ideation," despite the fact that he neither exhibited paranoid traits nor experienced hallucinations or delusions. The abstract also noted that plaintiff was oriented in the three spheres and that his physical condition was within normal limits. He had had a history of psychiatric hospitalization some ten years earlier. At the time of his discharge, plaintiff was diagnosed as having an anxiety reaction, "not psychotic" and "improved." Neurological tests taken at Jacobi Hospital's Emergency Room were found to be negative, and therefore normal (Tr. 57, 235).

Approximately three weeks after his discharge from Bellevue, plaintiff was admitted as an in-patient to Bronx State Hospital. The hospital records describe plaintiff's behavior just prior to admission as depressed and acutely agitated. He became concerned with "things looking dirty" and was frequently found washing the walls and floors. Plaintiff became both anoretic and insomniac, and exhibited depression as well as somatic preoccupations. The attending psychiatrist made a temporary diagnosis of incipient schizophrenia. Aggressive treatment, consisting of extensive drug and electroconvulsive therapy, was required because of "plaintiff's stormy hospital course" (Tr. 237). On final diagnosis, plaintiff was characterized as a chronic reactive depressive with anxiety in a borderline personality.

Although he was discharged in an improved condition, plaintiff was readmitted six months later to Bronx State Hospital. He again exhibited chronic reactive depressive tendencies and adjusted poorly to hospital routine (Tr. 238). Suicidal precautions were advised (Tr. 239). While noting the patient's concern with planets, monsters and science fiction, plaintiff's attending physician stated that he was well oriented with good memory and average intelligence, but that insight and judgment were impaired. Rivera was discharged from leave without consent status on January 20, 1969 in an improved condition (Tr. 240).

Plaintiff has also had extensive contact with the Bronx-Lebanon Hospital Center ("Bronx-Lebanon"). He has used its outpatient services since June, 1968 (Tr. 132, 217, 225, 243), and was receiving treatment from Bronx Lebanon at the time of the hearing (Tr. 54–55). Upon the completion of a ninety-day daily therapy program, plaintiff engaged in treatment requiring group psychotherapy and chemotherapy (Tr. 55–56). The psychiatric resident felt that Rivera's emotional status rendered him unable to assume childrearing responsibilities (Tr. 132). Additionally, in a letter to the Social Security Administration dated March 15, 1978, the physician in charge of the day hospital stated that the plaintiff's prognosis was poor and that he was unem-

ployable. Rivera's poor prognosis was confirmed by another psychiatrist and social worker at the day center.

Plaintiff was also a patient at the Dr. Martin Luther King Health Center (the "King Center"). On December 11, 1973, Dr. Kuebler, a member of the team of physicians who had treated Rivera, stated that he had a history of severe psychologic disease which had rendered him unable to work (Tr. 129). Plaintiff was diagnosed by another physician as possessing an anxiety/depression (chronic) borderline character disorder, and a chronic peptic ulcer disease (Tr. 130). Plaintiff was receiving care for these ailments at the King Center and the Bronx-Lebanon Psychiatric Clinic in the latter portion of 1978.

Rivera took the following prescription drugs during the course of his treatment to alleviate or reduce the mental and physical symptoms he experienced: Librium and Darvon (Tr. 137), Thorazine (Tr. 151, 154, 155, 156, 158), Dormatol (Tr. 152, 164), Ethyl Chloride (Tr. 153, 163), Valium (Tr. 164, 165, 169), Nylanter (Tr. 180, 186), Visterol (Tr. 59, 60, 181).

Plaintiff's medical evidence with regard to his ulcer dates back to 1950 (Tr. 43, 107). Although medical tests show no evidence of an ulcer crater (only the existence of a mild deformity of the duodenal bulb (Tr. 171, 209)), Rivera has consistently experienced pain (Tr. 67, 81, 144, 145, 149, 152–55, 160, 163, 170, 177, 182–84, 244, 246). Medical reports also indicate that the pain is often accompanied by a vomiting of blood (Tr. 44, 149, 160). Plaintiff was hospitalized on three separate occasions (Tr. 45) and received out-patient care at the King Center (Tr. 46). Mylanta, Tylenol, Wembel and Donnatol have been prescribed to ease the pain resulting from this condition (Tr. 144, 169, 182).

## STATUTORY FRAMEWORK

The Act conditions eligibility for disability and SSI benefits on the satisfaction of both an income and disability test. This Court, however, need only address the question of whether the plaintiff is disabled[1] as defined under 42 U.S.C. § 423 concerning entitlement to disability insurance benefits, and 42 U.S.C. § 1382 concerning entitlement to SSI benefits.[2] The statute defines a disability as any inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." For purposes of this section,

" . . . an individual shall be determined to be under a disability only if his physicial [sic] or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A).

In determining whether a disability exists, the following factors are to be examined:

"(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience."

*Rivera v. Harris,* 623 F.2d 212, 215, 216 (2d Cir.1980); *Bastien v. Califano,* 572 F.2d 908,

---

1. See generally 42 U.S.C. §§ 403, 423, 1382. Since neither party has contested the findings of the ALJ with respect to the satisfaction of the earnings requirement, this Court accepts them as true. Plaintiff has therefore met the special earnings requirements of the Act between the dates of December 1967 (the date of the alleged onset of his disability) and September 1972 (Tr. 13–14).

2. The statutory definitions of disability and the burdens thereby imposed on plaintiff are identical under the sections of the Act dealing with disability insurance benefits and SSI benefits. *See Jock v. Harris,* 651 F.2d 133 (2d Cir.1981); *Hankerson v. Harris,* 636 F.2d 893, 895 n. 2 (2d Cir.1980); 42 U.S.C. §§ 423, 1382.

912 (2d Cir.1978); *Gold v. Secretary of HEW,* 463 F.2d 38, 41 n. 2 (2d Cir.1972), *Crespo, supra.* These factors, however, are to be used only as an aid in assessing the evidence, since "this court cannot reweigh the evidence adduced at the administrative level or substitute its judgment for that of the Secretary." *Reyes v. Harris,* 486 F.Supp. 1063, 1067 (S.D.N.Y.1980). This Court must decide only whether the Secretary's finding is supported by substantial evidence. "Substantial evidence means more than a mere scintilla, and is defined as such relevant evidence as a reasonable man might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). If the findings are supported by such evidence, they are conclusive. 42 U.S.C. § 405(g). *Parker v. Harris,* 626 F.2d 225 (2d Cir.1980); *Bastien, supra; Gold, supra.*

■ An applicant for disability insurance benefits bears the burden of proving his disability. The claimant has made out a prima facie case when he has established that his impairment prevents his return to his former employment. *Decker v. Harris,* 647 F.2d 291 (2d Cir.1981); *Parker, supra; Crespo, supra; Flores v. Dep't of Health, Education and Welfare,* 465 F.Supp. 317, 319–20 (S.D.N.Y.1978). To establish his entitlement for benefits, Rivera alleges that his emotional disorder and his ulcer have rendered him unable to return to his previ-

ous employment.[3] The Court will examine the validity of each claim in turn.

*(A) Psychiatric Claim*

It is now well recognized that a cognizable claim for disability can exist when an infirmity includes a personality disorder. *See Crespo, supra,* 484 F.Supp. at 1171; *Flam v. Califano,* 469 F.Supp. 793, 795 (E.D. N.Y.1979); *Rayborn v. Weinberger,* 398 F.Supp. 1303 (N.D.Ind.1975). This progressive attitude toward mental illness is reflected in the Secretary's recent revision of the regulations. Neurotic disorders and other functional nonpsychotic disorders are among the various mental disorders included in Appendix I of the revised regulations which lists those "medical considerations which justify a finding that an individual is under a disability." 20 C.F.R. § 404.-1504(a)(2) (1979).

■ Plaintiff has presented ample evidence for the period from 1967 (the alleged onset of the illness) to 1978 (the time of the hearing),[4] which unequivocally demonstrates the existence of a mental disorder. Rivera was variously diagnosed by his treating physicians as suffering from anxiety reaction, incipient schizophrenic reaction, chronic reactive depression, asthenic personality with depression, and schizophrenia undifferentiated type with some depressed overtones.[5] The ALJ accepted

---

**3.** Plaintiff's claim that he is unable to return to his previous employment is sufficient to establish his initial burden of proof if it is substantiated by medical evidence. *See Crespo v. Harris,* 484 F.Supp. 1167, 1174 (S.D.N.Y.1980); *Rossi v. Califano,* 602 F.2d 55, 57 (3d Cir.1979); *Hephner v. Mathews,* 574 F.2d 359, 361 (6th Cir.1978).

**4.** The fact that some of the clinical and medical evidence concerning Rivera's condition relates to events after the end of his insured period is of no consequence. All of this evidence is relevant and admissible because "the diagnosis of a claimant's condition may properly be made even several years after the actual onset of the impairment," *Stark v. Weinberger,* 497 F.2d 1092, 1097 (7th Cir.1974), as quoted in *Parker v. Harris,* 626 F.2d 225, 232 (2d Cir.1980), and because " 'it may disclose the severity and continuity of impairments existing before the earning requirement date....' " *Gold v. Secretary*

*of HEW,* 463 F.2d 38, 41–42 (2d Cir.1972), *quoting Carnevale v. Gardner,* 393 F.2d 889, 890 (2d Cir.1968).

**5.** The mere fact that several physicians have diagnosed a particular claimant's mental condition differently does not compel a conclusion that the claimant is not suffering from a mental impairment. As noted in the Regulations, 20 C.F.R. § 404.1598 (12.00 A):

"The criteria for severity of mental impairment(s) are so constructed that a decision can be reached even if there are disagreements regarding diagnosis. All available clinical and laboratory evidence must be considered since it is not unusual to find, in the same individual, signs and test results associated with several pathological conditions, mental or physical. For example, an individual might show evidence of depression, chronic brain syndrome, cirrhosis of the liver, etc., in various combinations."

these medical opinions as true and supported by the evidence (Tr. 13, 14). The mere existence of a mental disturbance, however, does not constitute a "disability" for social security purposes absent evidence of functional loss. *Reyes, supra; Seislowski v. Secretary of Health, Education and Welfare,* 477 F.Supp. 682 (E.D.N.Y.1979); *Fessler v. Mathews,* 417 F.Supp. 570 (D.C.N.Y. 1976); *Alvarado v. Weinberger,* 511 F.2d 1046 (C.A.Puerto Rico 1975). In determining whether or not a functional loss is present, the regulations require the Secretary to consider:

> "... the nature and clinical manifestations of the medically determinable impairment(s) as well as consideration of the degree of limitation such impairment(s) may impose on the individual's ability to work, as reflected by (1) daily activities both in the occupational and social spheres; (2) range of interest; (3) ability to take care of personal needs; and (4) ability to relate to others." 20 C.F.R. § 404.1598 (12.00 A).

Using these factors as guidelines to evaluate the Secretary's decision, the record refutes the ALJ's finding that no functional loss exists.

Rivera's daily activities "in the occupational and social spheres" and his "ability to relate to others," are clearly minimal. One of the earliest manifestations of plaintiff's mental collapse was his inability to work with others. Arguments were frequent because he was so easily upset. "It was hard for me to take orders ..." and "I thought everybody was against me." Rivera further testified, "I don't go around with people too much. I'm always by myself." (Tr. 40, 58, 69–70). Plaintiff's relationship with his immediate family members was similarly strained. He stated that the breakdown in his marriage was largely due to his illness. (Tr. 71). While "[s]tatements by the applicant, including his own description of his impairment (symptoms) are, alone, insufficient to establish the presence of a physical or mental impairment," they are valid insofar as they are supported by clinical and laboratory diagnostic findings. 20 C.F.R. § 404.1501(c). Here, an abstract

from Bronx State Hospital shows that plaintiff's fears that he would die and that his "head was going to break" rendered him so depressed and agitated that he projected them onto his family. These anxiety attacks were characterized by screams of "don't let my children die!" (Tr. 235), or by a failure to recognize his family altogether. Cf. *Berry v. Schweiker (Secretary of Health and Human Services),* 675 F.2d 464 (2d Cir. 1982) (failure to prove "seriously impaired ability to relate to other people").

Medical records from plaintiff's second admission to Bronx State Hospital provide additional evidence of his inability to work with others. Rather than taking advantage of the staff's willingness to help him, plaintiff attempted to leave the hospital and its group activities. One physician described him as badly in need of psychiatric treatment and a candidate for shock therapy. Another called him "a total loss to himself and society" (Tr. 134). Suicidal precautions were advised. Dr. Keubler, in an independent report four years later, confirmed this prior report and found that plaintiff is still easily upset and "feels better working away from other people." In September of 1975 a physician stated that plaintiff's most important treatment "is steady contact of a supportive nature to help him with family situation. He will benefit by continuous contact ... with someone he can trust" (Tr. 168).

Plaintiff offered other evidence to establish his functional loss. Doctors at the King Center and Bronx-Lebanon agreed that plaintiff's prognosis was poor, and that he was unable to work and was thus unemployable (Tr. 129, 217). Dr. Schatylin reported in 1978 that unless there was a dramatic change, plaintiff's disability would continue indefinitely. He stated that plaintiff's condition also caused a diminishment in his relationships with others and his interest in external affairs (Tr. 227). His increased apathy, referred to as "flat effect" by some doctors (Tr. 166, 228), may have been due in part to his periodic insomnia attacks (Tr. 81, 140, 221). Dr. Schatylin noted Rivera's improvement but found his

progress to be poor (Tr. 226–27). The Secretary's own consultant, Dr. Starace, agreed with these findings and additionally found a moderately severe deterioration in plaintiff's personal habits. Together, these reports demonstrate that plaintiff's condition affected "his range of interest" and his "ability to take care of personal needs." See 20 C.F.R. § 404.1598 (12.00 A).

The Secretary argues that these opinions are conclusory and unsupported by clinical findings. The Secretary is impliedly referring the Court's attention to 20 C.F.R. § 404.1526, which reads in pertinent part that "a statement by a physician that an individual is, or is not, 'disabled,' 'permanently disabled,' 'totally disabled,' 'totally and permanently disabled,' 'unable to work,' or a statement of similar import, being a conclusion upon the ultimate issue to be decided by the Secretary, shall not be determinative of the question of whether or not an individual is under a disability." This regulation, however, does not in and of itself render these opinions worthless and without merit. The regulation specifically states that:

> "The weight to be given such physician's statement depends on the extent to which it is supported by specific and complete clinical findings and *is consistent with other evidence* as to the severity and probable duration of the individual's impairment or impairments." *Id.* (emphasis added).

Thus, even if the Secretary were to determine that these opinions were conclusory, they must be afforded substantial weight since eleven physicians agree as to the seriousness of plaintiff's illness, the degree of his impairment, and the limitations they impose on him. *See Chiappa v. Secretary of Health, Education and Welfare,* 497 F.Supp. 356, 360 (S.D.N.Y.1980). It is also well settled in this Circuit that the expert opinion of a treating physician is binding on the Secretary when no contradictory evidence is presented. *Eiden v. Secretary of Health, Education and Welfare,* 616 F.2d 63 (2d Cir.1980); *Bastien, supra,* 572 F.2d at 912; *accord Gold, supra.* This rule of law is applicable to psychiatrists as well as to other treating physicians.

The Secretary acknowledges these principles of law, but finds them inapplicable to this case. He cites portions of the record and the ALJ's hearing decision to demonstrate the existence of contradictory medical evidence, thereby rendering the statements of the treating physicians non-binding. He contends that the ALJ's reference to plaintiff's discharge and present out-patient status illustrates Rivera's significant improvement and the absence of any disability. The Secretary also highlights the record to demonstrate that following a course of drug/shock therapy and/or psychotherapy after each of plaintiff's many hospitalizations, he was released "improved," "not psychotic," "well oriented with a good memory and of average intelligence," and "he was well oriented in three spheres."

The ALJ and the Secretary fail to see a consistent and serious pattern of psychological disease because of their overemphasis on Rivera's periodic improvement. Plaintiff has been repeatedly institutionalized between the years 1967 and 1978. While Rivera may have been released in an improved condition from each hospital, it is clear that release from an institution does not in and of itself establish that an impairment no longer exists. *Maybin v. Califano,* CCH Unempl.Ins.Rep. ¶ 16,376 (D.S.C. Dec. 15, 1978). Because mental disorders are typically deeply rooted in an individual's personality, years of therapy are often necessary before these conflicts are uncovered and subsequently resolved. During this course of treatment, it is not uncommon for a patient with a diagnosed mental disorder to exhibit alternating signs of improvement and regression while still retaining the underlying mental disorder. The record here discloses these stages in the course of plaintiff's illness; nevertheless, he is still eligible for benefits where, as here, the record also establishes severe and persistent symptoms with resulting persistence of marked restriction of daily activities, constriction of interests and seriously impaired ability to work with other people. 20 C.F.R. § 404.-

1598 (12.00 A). *See Doe v. Harris,* 495 F.Supp. 1161 (S.D.N.Y.1980). Additionally, the regulations regarding mental disorders do not require that the maladaptive behavior be manifest throughout the period of claimed disability. Nor do they state how long a symptom-free period is needed before a disorder may be presumed to have sufficiently abated so that it is no longer disabling. See *Doe, supra;* 20 C.F.R. § 404.1598 (12.00 A).

Much of the evidence relied on by the ALJ, when viewed in its totality, is inconsistent with his finding of not disabled. For example, the ALJ relied on the report of Dr. Starace, the Secretary's own consultant, to support his finding that the plaintiff's "mental disorder does not interfere with his work-related functions on a continuous day to day basis so as to preclude engaging in substantial gainful activity" (Tr. 14). The ALJ highlighted various parts of the report which stated that plaintiff's

> "speech was normal, relevant and coherent with no evidence of loosening of association. Although his affect was constricted and flat, the doctor felt his mood was more apathetic than depressed. Insight and judgment were slightly defective but he was correctly oriented in all three spheres." (Tr. 12).

However, Dr. Starace also found plaintiff's intellectual capacity, his attention and his concentration below average.[6] He states that plaintiff's ability to perform repetitive or varied tasks is seriously impaired. Dr.

Starace's final diagnosis is that Rivera suffers from schizophrenia—chronic undifferentiated type with some depressed overtones. His prognosis is "poor."

*(B) Ulcer*

In addition to his mental disorder, plaintiff alleges disability based on the pain and the discomfort from an ulcer condition. Where a claimant has alleged more than one disabling ailment, the Secretary must consider their cumulative effect, rather than the effect of each element in isolation. *Locklear v. Mathews,* 424 F.Supp. 639 (D.Md.1976); *Brittingham v. Weinberger,* 408 F.Supp. 606 (E.D.Pa.1976). This is especially true where, as here, the evidence demonstrates a link between the mental and the physical disorders underlying the two claims.

Here, the objective medical evidence indicates that plaintiff's ulcerous condition is the result of a conversion reaction.[7] The physician at King Center stated that while it was possible that some of Rivera's physical concerns might have been hypochondriacal or delusional in nature, it was clear that they were manifestations of guilt (Tr. 169). Dr. Schatylin, in confirming this prognosis, noted that Rivera's ulcer symptoms were related to his acute anxiety episodes (Tr. 227). Rivera's own statements dealing with his own self-image tended to strengthen the clinical diagnoses of the attending physicians.[8]

---

6. Thus, this is not a case where the claimant has a mental condition such as chronic depression neuroses, is well oriented, has average judgment, insight, intellectual capacity, and unimpaired memory, is totally without psychotic symptoms and is responsive to therapy. Cf. *Amendola a/k/a Lafante v. Secretary of Health, Education and Welfare,* CCH Unempl. Rept. ¶ 15,407 (S.D.N.Y. Aug. 4, 1977) (reversing finding of disability). See also *Berry v. Schweiker (Secretary of Health and Human Services),* 675 F.2d 464 (2d Cir.1982) (individual with inadequate personality and borderline intelligence held not disabled).

7. The court in *Combs v. Gardner,* 382 F.2d 949, 954 (6th Cir.1967), used a psychiatric glossary and defined a

"'conversion reaction' (also referred to as 'somatic conversion') as a reaction in which unacceptable unconscious impulses are converted into bodily symptoms. Instead of being experienced consciously, the emotional conflict is expressed by physical symptoms. In a broad sense, all neurotic reactions may be regarded as somatic, physiologic, or psychologic 'conversion,' but technically the term is usually restricted to its somatic aspects."

8. One doctor noted that plaintiff sees himself as a "sick" individual. "He generally presents himself as a weak, passive individual . . . and it is only within the context of his sickness that his aggression is seen." (Tr. 169).

When the ulcer is thus viewed as a psychosomatic condition, the medical evidence in the record becomes logically consistent. This psychosomatic condition explains how three different physicians diagnosed Rivera as suffering from chronic ulcer disease even though his physical workups revealed no evidence of an ulcer crater (only a mild deformity of the duodenal bulb (Tr. 171, 209)), and his GI series was normal (Tr. 213). Plaintiff's subjective evidence with respect to his alleged pain must similarly be evaluated in light of his conversion or psychosomatic condition. "The fact that there may be a large element of psychosomatic overlay to an applicant's condition, does not preclude an award of benefits[;] ... [the pain] is just as real to him and just as disabling." *Miracle v. Celebrezze,* 351 F.2d 361, 374 (6th Cir.1965); see also *Chiappa, supra; Beggs v. Celebrezze,* 356 F.2d 234 (4th Cir.1966); *Walson v. Gardner,* 381 F.2d 580 (6th Cir.1967).

▮ Plaintiff's testimony at the hearing regarding his pain left sufficient cause to doubt its actual severity. *Combs v. Gardner,* 382 F.2d 949 (6th Cir.1967). While it is well accepted that subjective claims of pain alone can establish disability, even if unaccompanied by clinical findings or other medical objective evidence, *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir.1979), cited in *Aubeuf v. Schweiker,* 649 F.2d 107 (2d Cir. 1981), the ALJ "has the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in the light of medical findings and other evidence regarding the true extent of the pain alleged by the claimant." *Marcus, supra,* 615

F.2d at 27, quoted in *McLaughlin v. Secretary of Health, Education and Welfare,* 612 F.2d 701, 705 (2d Cir.1980); *accord, Italiano v. Secretary of Health, Education and Welfare,* 458 F.Supp. 982 (E.D.N.Y.1978), *aff'd,* 603 F.2d 213 (2d Cir.1979). Rivera testified that he had experienced acute episodes of pain which had occurred two or three times weekly and have persisted for periods greater than two weeks. These attacks have often been so extreme as to make him fall on the floor (Tr. 68). Although plaintiff testified that this pain causes him to spend most of his time in bed (Tr. 75),[9] the ALJ discredited his testimony when subsequent inquiry revealed that only a few hours per day are actually spent lying in bed (Tr. 75–76).

While the ALJ concluded correctly that Rivera's abdominal condition is not so severe as to be *per se* disabling (Tr. 13),[10] he failed to consider evidence concerning this condition in combination with Rivera's mental condition. Rivera's treating physician, Dr. Schatylin, felt that the combination of the psychiatric and organic problems rendered him unable to work (Tr. 226). The vocational expert and the Secretary's consultant, Dr. Starace, expressed a similar opinion, the latter also noting that Rivera's ulcer pain severely restricted his mode of living (Tr. 229). In addition, plaintiff told Dr. Starace that the pain limits his physical exertion to the performance of only light and periodic household chores. Accordingly, most of his time is spent watching television or sleeping, since it requires minimal physical movement and since his prescribed medicine makes him so drowsy (Tr. 229).

---

9. Plaintiff's testimony during the hearing revealed that when his ulcer acts up it "sometimes bleeds" and causes him a great deal of pain (Tr. 67). He experienced difficulty with simple movements such as sitting, walking and picking things up, and often felt the need to lie down (Tr. 67–68, 73–74). He further testified that

> "sometimes in the morning I can't get up out of bed. I have to stay in bed because—you know, to go to the bathroom then I throw up and I got to go back to bed. Sometime when I get up I feel like I got a burn here. When I try to get up I have to lie down again." (Tr. 67).

10. Plaintiff's ulcer condition is not so severe as to be *per se* disabling. *See* Appendix I of the regulations; *cf. Lebron v. Secretary of HEW,* 370 F.Supp. 403 (D.P.R.1974) (Secretary's finding of nondisability based on an ulcer condition was reversed because plaintiff's condition was found to be *per se* disabling under the regulations). Because I find that plaintiff's impairments in combination render him disabled, it is unnecessary to address defendant's contention that plaintiff's ulcer is a remediable condition and therefore not disabling under the Act.

When viewing plaintiff's medical evidence concerning the ulcer in conjunction with the medical evidence regarding his mental condition, it is clear that plaintiff's pain and discomfort from his ulcer are linked to his emotional state. It is equally clear that he cannot work effectively. His impairments—in combination—prevent him from engaging in substantial gainful activity.

### (C) Vocational Expert's Testimony

Rivera has met his burden of establishing that the combined effects of his mental and ulcer conditions have rendered him disabled. The evidence shows that his impairments have prevented him from engaging in his former occupations for a continuous period of at least twelve months. This places on the Secretary the burden [11] of showing the existence of "alternative substantial gainful work which exists in the national economy and which the claimant could perform considering not only his physical capability but his age, his education, his experience and his training." *Parker, supra,.* 626 F.2d at 231, as quoted in *Aubeuf, supra,* at 112; *Campbell v. Secretary of Health and Human Services,* 665 F.2d 48 (2d Cir.1981). Here, the ALJ found that "[t]he claimant retains the residual functional capacity [12] to perform at least the sedentary to light work enumerated by the vocational expert, all of which exist in significant numbers in the region where claimant lives" (Tr. 14). Examination of the vocational expert's testimony at the hearing refutes this finding.

The vocational expert, Mr. Mooney, testified that he had studied the vocational potentialities of individuals with various types of impairments, including the combination of physical and psychological impairments from which plaintiff claimed to be suffering. Acting upon the assumption that the plaintiff was not suffering from any mental or physical infirmity, Mr. Mooney identified various light and sedentary jobs which he felt plaintiff could perform based on his age, education, training and background (Tr. 77–79). The majority of these positions consisted of operating and/or tending assembly line machines. However, when he assumed the truth of Rivera's claimed limitations, restrictions and pain, Mr. Mooney testified that plaintiff would not be able to resume his prior work activities or perform any light or sedentary type of work (Tr. 80–81). Explaining his reasons for this conclusion he stated:

> "The main one [reason] is the chronic depression. Second to that is the ongoing problems with his ulcer that causes him

11. "The showing required of the Secretary has two principal components. See *McLamore v. Weinberger,* 538 F.2d 572, 574 (4th Cir.1976). First, the Secretary must show that the claimant's impairment is of a kind that still permits certain types of activity, such as lifting or walking, necessary for other occupations, and that the claimant's experience involves skills transferable to other work. Second, the Secretary must present evidence showing the existence of specific types of jobs, available in the national economy, suitable for a claimant with these capabilities and skills. See, e.g., *Bastien v. Califano,* 572 F.2d 908, 912–13 (2d Cir.1978)."
*Decker v. Harris,* 647 F.2d 291, 294 (2d Cir. 1981).

12. Residual functional capacity is defined in pertinent part as follows:
"[Y]our impairments may cause physical and mental limitations that affect what you can do in a work setting. Your residual functional capacity is what you can still do despite your limitations. If you have more than one impairment, we will consider all of your impairments of which we are aware. We consider your capacity for various functions as described in the following paragraphs, (b) physical abilities, (c) mental impairments, and (d) other impairments. Residual functional capacity is a medical assessment. However, it may include descriptions (even your own) of limitations that go beyond the symptoms that are important in the diagnosis and treatment of your medical condition. Observations of your work limitations in addition to those usually made during formal medical examinations(,) may also be used. These descriptions and observations, when used, must be considered along with the rest of your medical record(,) to enable us to decide to what extent your impairment keeps you from performing particular work activities. This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment."
20 C.F.R. § 404.1545(a).

pain and discomfort at any and all times. Third, and that may be for a combination of reasons, I'm not a doctor, is his inability to sleep. I mean, if this is again chronic he would never be physically fit or alert enough to really work." (Tr. 81).

Mr. Mooney's testimony is consistent with Dr. Starace's report that Rivera's ability to perform repetitive or varied tasks is seriously impaired. Rivera's own testimony confirmed Dr. Starace's conclusion that plaintiff's attention and concentration were below average. Rivera explained that his prescribed medication causes drowsiness and a drunken-like feeling. It cannot be disputed that impaired concentration and inability to remain alert would pose a clear safety threat to a machine operator—one of the ALJ's enumerated job recommendations for Rivera.

## CONCLUSION

I find that Rivera's psychological and physical impairments, in combination as they must properly be considered, render him disabled. The ALJ's conclusion to the contrary is not supported by substantial evidence. This conclusion is mandated by the numerous medical reports contained in the record, by the report of the Secretary's own medical consultant, and by the testimony at the hearing of the vocational expert called by the ALJ. Accordingly, summary judgment in favor of the plaintiff reversing the determination of the Secretary is granted and defendant's cross-motion is denied.

Settle judgment on notice.