**David REINHART, Plaintiff,**

v.

**Richard SCHWEIKER, Secretary of Health and Human Services, Defendant.**

**No. G 81–275.**

United States District Court, W.D. Michigan, S.D.

May 21, 1984.

John W. Simpson, Jr., Detroit, Mich., for plaintiff.

John A. Smietanka, U.S. Atty., Grand Rapids, Mich., for defendant.

## OPINION

ENSLEN, District Judge.

This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Secretary of Health and Human Services that Plaintiff is not entitled to the establishment of a period of disability or to disability insurance benefits as provided for in Sections 216(i) and 223 of the Act, 42 U.S.C. §§ 416(i) and 423.

Plaintiff initially filed an application for disability insurance benefits on July 29, 1977, alleging disability as of March 3, 1977 for "back and neck." That application was denied on August 31, 1977, and again on reconsideration in December of that year. On August 18, 1979 Plaintiff filed a second application for an alleged disability of "chronic back and neck pain," again stating

the onset date as March 3, 1977. The denial of the second application was affirmed on reconsideration in March 1980, and a hearing was held before an Administrative Law Judge (ALJ) on November 7, 1980. In a decision dated December 5, 1980 the ALJ concluded that Plaintiff is not disabled; the Appeals Council denied review, making the ALJ's decision the final decision of the Secretary. Plaintiff filed this action on May 28, 1981, and the case is now before the Court on cross Motions for Summary Judgment filed in August and November, 1982.

The Secretary argues that the finding of no disability based upon the Plaintiff's first application for benefits is *res judicata* since denial of that application on reconsideration was never appealed. Therefore, the Secretary argues, Plaintiff cannot be found disabled for the period from March 1977 through August 31, 1977, and must prove that his condition worsened after August 31, 1977.[1] Plaintiff's brief does not address the Secretary's *res judicata* argument, but merely argues that Plaintiff should be found disabled as of the March 3, 1977 date.

The pertinent regulations provide that a reconsidered determination is final and binding unless a hearing is requested and a decision rendered. 20 CFR § 404.916 (1980).[2] Furthermore, the regulations expressly provide for the application of administrative *res judicata* as grounds for dismissing a hearing request, where there has been a previous determination with respect to the same facts and issues, which has become final. 20 CFR § 404.937(a). Notwithstanding these provisions which seek to ensure the finality of determinations, the regulations provide that a determination which is otherwise final may be reopened after 12 months and within 4 years from the date of notice of the initial determination, upon a finding of good cause for reopening. 20 CFR § 404.957. "Good cause" includes those cases where new and material evidence is furnished after the initial determination. 20 CFR § 404.958.

In this case, Plaintiff filed his second application well within the four year period for reopening his original 1977 application. At the second hearing, new evidence was submitted and considered by the ALJ in addition to medical records which had been available at the time of the initial determination. The notice of the November 7, 1980 hearing stated that it involved both the July 29, 1977 and August 18, 1979 applications. (Tr 15). Moreover, the ALJ proceeded to decide Plaintiff's application on the merits dating back to Plaintiff's alleged onset date of disability of March 3, 1977.

 Under these circumstances, the second application for benefits and the 1980 hearing constituted an effective reopening of the 1977 proceedings. *Wilson v. Califano,* 580 F.2d 208 (CA 6 1978); *Farley v. Califano,* 599 F.2d 606 (CA 4 1979); *Brown v. Heckler,* 565 F.Supp. 72 (ED Wis 1983). These cases hold that where the proceedings on the second application have effected a reopening of the earlier claim, it is proper for the district court to review the entire claim made by the Plaintiff in the second application even though all or part of it may be the same as the original application. Likewise in this case I conclude that it is appropriate to consider (as did the ALJ) all of the evidence in light of Plaintiff's claim that he has been suffering from a disability since March 3, 1977.

Plaintiff, who was 38 at the time of hearing, was injured at work in late September or early October, 1975, when he attempted to lift an extremely heavy ob-

---

1. The August 31, 1977 date is the date of the initial denial of Plaintiff's 1977 application. For some reason, inconsistent with the Secretary's argument, the Secretary does not refer to the December 19, 1977 date of the denial of Plaintiff's request for reconsideration. However, since I conclude that there is no *res judicata* effect in this case, this discrepancy is of no importance.

2. All CFR Citations are to the 1980 compilation. However, I note that the regulations applicable here have not changed to any great degree since that time.

ject, injuring his neck and back. (Tr 26, 44–45). At the time, Plaintiff was employed at Chrysler, where he had worked since August 1964. His past work experience includes work at Chrysler as a conveyor operator, a job setter, engine analyst, and warranty inspector. Although Plaintiff experienced difficulties with his neck and back following the 1975 incident, and was on disability leave for some time, he continued to work at Chrysler until March 3, 1977. Apparently, during that time Chrysler made efforts to accommodate Plaintiff's exertional restrictions, but without success. At the time of hearing, Plaintiff was receiving workers compensation, a disability pension through Chrysler, and widowers social security benefits.

Plaintiff testified that he is able to take care of himself, and he is also raising his two young daughters. He testified that he can drive sometimes and is sometimes unable to drive. Plaintiff does some housework, but his children assist him a great deal, and many times he has paid teenagers to do cleaning and laundry for them. (Tr 29–30). Plaintiff testified that he does most of the cooking, although he is occasionally unable to cook because of pain, but he does not do much laundry because of the bending involved. (Tr 30). His activities include physical therapy three times a week at the hospital; he also will stop in at a coffee shop, works on chores around the house at his own pace, attends AA meetings, visits relatives and occasionally plays cribbage with his father. (Tr 30).

According to the Plaintiff he lives with pain 24 hours a day (Tr 25), and he takes muscle relaxants and arthritis pills every morning and every night. (Tr 25–26, 31). He states that he experiences pain from the neck down, and to the left knee with swelling in the upper thigh if he engages in strenuous activity. In that case, he stays off his feet for a few days in order for the swelling to go down. (Tr 27–28). Plaintiff has used a home traction device and he wears a cervical collar when he sleeps, to minimize the neck pain. (Tr 33). Upon questioning by his attorney, Plaintiff testified that he can sit for only about 20 min-

utes before he has to get up, he can walk only 30–40 minutes at a time, and he avoids bending and climbing stairs. (Tr 34–35). He testified that he will stand as a relaxation to get away from sitting. (Tr 34). He testified that after a hospitalization in October of 1980 he experienced three days without pain, but the pain returned when he did the dishes. (Tr 36–37).

Plaintiff explained that the pain he feels is worse at times:

> I get to the point where I don't—I don't speak to nobody, I don't answer that phone or the door or nothing. Then the kids can tell. A lot of times they know when I'm in pain. They go to a friend's house or outside or something cause I get—I turn, you know, to just a monster. I don't want to even talk to anybody....

> ... there ain't much I can do. Sometimes I walk away and I try to gather my thoughts, I'll lose my pattern of thought, try to regain it, try to put my mind someplace else, think of something different, you know.

> ... sometimes I can go a couple of weeks be—but then it don't happen. Then again there—sometimes it happens a couple times a week and that depends on maybe what I am doing or if I slept the wrong way or turned the wrong way in my sleep, sort of wherever it ignites the situation I guess you might say. (Tr 37–38).

Plaintiff testified that the medication does not relieve the pain, and that he has turned to drink to relieve it (Tr 38), although he is controlling his alcohol problem. (Tr 29).

Plaintiff testified that the doctor has advised him to lie on the floor and pull his knees up when he experiences pain. Sometimes Plaintiff will walk away and try to walk off the pain. (Tr 43). According to Plaintiff, he will walk for 10 or 15 minutes to get the pain out of his system, but the 10 or 15 minutes does not always ease the pain. (Tr 43–44).

After his injury, Plaintiff completed his GED, and attended Henry Ford Community College for one year. That was under the

auspices of Chrysler's vocational rehabilitation for Plaintiff. (Tr 40–41). Plaintiff had hoped to be able to train as a chef, but his doctor advised that he would be unable to do the work. (Tr 41). So Plaintiff's vocational counselor recommended that he pursue work in the field of traffic and transportation, which would be purely a paperwork job. According to the Plaintiff, he took the course for a year but was unable to catch on. (Tr 41–42). Plaintiff also testified that he studied on his own to become an insurance salesman, but flunked the test twice. (Tr 42). Plaintiff did obtain employment in early 1979, with a car dealer. His job was to be as a parts salesman, and it was represented to him as 80% paperwork. However, Plaintiff's experience was that too much manual labor was involved, and he worked there only six weeks because of the lifting and bending that was required of him. (Tr 31–32). Plaintiff testified that he has done some volunteer work for senior citizens, such as giving people a ride to the doctor or cooking their lunch or doing some cleaning or dusting. (Tr 32). He testified that this job only involved two hours per week. (Tr 33). According to Plaintiff, after his failure in traffic and transportation, he was advised at vocational rehabilitation that they were not going to be able to find anything for him, even with schooling, because of Plaintiff's back problem. (Tr 42–43).

The medical evidence fairly consistently reflects a diagnosis of cervical and lumbosacral strain or inflamation. Dr. Kelley saw Plaintiff from November 1975 through March 1977 on a regular basis, and again in June 1977, December 1977, and July 1978. Dr. Kelley concluded that Plaintiff suffered from chronic fibromyositis of the cervical area and a chronic lumbosacral strain, secondary to an unstable lumbosacral junction. (Tr 144). Dr. Kelley's notes throughout the years he treated Plaintiff indicate that neurologically, no signs were present, and that x-rays were also negative, but that Plaintiff consistently had pain and discomfort on flexion and extension, lateral bending and rotations. By the end of July 1976 Dr. Kelley reported that Plaintiff

"checked out rather well" (Tr 115) and continued doing well in September (Tr 114). But in early October 1976, Dr. Kelley reported "a good amount of muscle tenderness." Plaintiff's ranges of motion were full, but with pain, and Dr. Kelley found "quite marked tenderness over the left gluteus muscle just above the spine of the scapula." He also found "positive lumbosacral signs," and ordered Plaintiff to avoid repetitive stooping, bending and lifting. (Tr 113).

Plaintiff underwent therapy in late 1976, and though in December he still had some tenderness over the ligaments in the low cervical area, it was not marked. (Tr 109). However, in early 1977 Dr. Kelley noted that Plaintiff was experiencing continued tenderness, and opined that even if Plaintiff's condition indicated a functional component, it still presented a problem concerning Plaintiff's ability to work. Dr. Kelley again restricted Plaintiff from repetitive stooping, bending and lifting, and use of the arms above shoulder level. (Tr 108).

In February 1977, Dr. Kelley again noted Plaintiff's continued difficulty with tenderness in the cervical area, and pain with repetition of movement in the lumbosacral spine. (Tr 107). On March 1, 1977 Dr. Kelley reported that the lumbosacral signs were "quite markedly positive," although neurologically the signs were still negative. (Tr 105). That condition continued throughout March. (Tr 103–104).

On June 3, 1977 Dr. Kelley was of the opinion that Plaintiff was unable to return to his former work or do any work involving repetitive stooping, bending, lifting, prolonged standing and walking or using his arms above the shoulder level. He noted that Plaintiff was to obtain his GED and was to undergo rehabilitation training for sedentary work (in the traffic and transportation course). At this time Dr. Kelley opined that Plaintiff would be able to do a sedentary type of work with vocational training. (Tr 135). Dr. Kelley reported in December 1977 that Plaintiff's condition remained chronic in the cervical and lumbar areas. He reported quite good

range of motion of the cervical spine, but when motions are repeated four or five times "there is definite discomfort in the low cervical area." Dr. Kelley found that Plaintiff's motion was limited in the lumbar spine, with flexion of 50° and extension of only 10°. Lateral bending and rotations were limited to 12° in each direction. Dr. Kelley reports "on passive attempts to increase the ranges of motion, there is definite discomfort at the lumbosacral level." When Plaintiff was lying down, lumbosacral manipulations were positive from both sides, and although straight leg raising was neurologically negative, Plaintiff had discomfort at 60° bilaterally. X-rays of the cervical spine were basically normal, but lumbar x-rays showed degeneration of the articular facet on the left side at the lumbosacral level. (Tr 143–144).

In a letter dated January 29, 1979, Dr. Kelley advised that he last saw Plaintiff on July 25, 1978, and found that Plaintiff's condition remained chronic. The January 29 letter states that Plaintiff should not engage in: prolonged stooping, bending, lifting, the forceful use of the upper extremities, particularly above the shoulder level, and repetitive motions of the head and neck or sustained use of the head in a fixed position, particularly the flexed position. (Tr 145–146).

The medical evidence also includes a letter from a Dr. Midgley, dated April 8, 1977, in which Plaintiff is reported to have limited cervical motion, with pain, and Dr. Midgley opined that Plaintiff was not able to work. (Tr 130).[3] In a medical exam conducted May 3, 1977, by the State Department of Education-Vocational Rehabilitation, Plaintiff was diagnosed as suffering chronic lumbar and cervical myofascitis, and was to limit walking and standing, and avoid stooping, kneeling, lifting, reaching, pushing and pulling. Dr. Newman, who conducted that examination, opined that Plaintiff was physically able to enter employment or training full time, noting that Plaintiff was okay for the type of training

planned (as a transportation clerk), but that Plaintiff was to avoid exertional activity. (Tr 133–134).

Plaintiff was evaluated by Dr. LaHood in July 1977. Dr. LaHood noted that Plaintiff's main problem was with his lower back, with pain radiating to the left leg and a sensation of swelling of the left leg and arm. He did note that Plaintiff still had some neck pain. Dr. LaHood found that Plaintiff presented full range of motion of the neck with no local spasm, but some tenderness in the suboccipital area of the left side. He found Plaintiff had decreased sensation in the median and ulnar nerve distribution of the left hand. Examination of Plaintiff's back revealed decreased flexion, with Plaintiff able to reach only within 18 inches of the floor, and encountering difficulties standing up from that posture. Dr. LaHood noted that he found "very little objective findings that correlate with the amount of disability that the patient claims." (Tr 136–137).

A 1979 x-ray report revealed an essentially normal cervical spine, with mild anterior spondylosis. X-rays of the lumbar spine revealed a suggestion of spondylolysis of L6 on the right, but upon obtaining Planograms, no evidence was found of spondylolysis of L6, but rather a small defect in L5 was revealed. (Tr 148). In October 1979, Dr. Giese examined Plaintiff and found forward flexion of the cervical spine was limited to 10° and hyperextension appeared to be full. Lateral flexion and rotation was about 20°. A lumbar examination revealed forward flexion to a full 90° but with complaints of pain. Hyperextension was also complete, but with complaints of pain at the left lumbar area. Dr. Giese found straight leg raising positive in the sitting position with pain in the lumbar area, and pain with the leg raised from a supine position. No neurological deficits were shown and no significant x-ray findings were made. Dr. Giese concluded that

---

**3.** The record supplied to the Court does not contain page 131 of the transcript, which is the second page of Dr. Midgley's letter. However, the ALJ notes that Dr. Midgley was of the opinion claimant was unable to work (Tr 10), and for the purposes of this Opinion, the missing page is not critical.

Plaintiff's condition could only be interpreted as persistent strain and that Plaintiff would be suitable for retraining in light work. (Tr 149–151).

In early 1980, Plaintiff suffered a fall on the ice, and was hospitalized from February 13 through February 17. Dr. Custer reports that Plaintiff had "considerable tenderness and muscle spasm of the left lower lumbar muscle" at that time. An x-ray of the lumbosacral back and coccyx revealed a mild degree of osteoarthritic changes of the lower lumbar back. Plaintiff progressively made some improvement and was discharged with a diagnosis of contusion, sprain, left lumbar back. (Tr 152–153). The file also contains a letter from a Dr. Lignell dated November 6, 1980, in which Dr. Lignell opines that Plaintiff does have a physically disabling condition. (Tr 160). In addition, a November 3, 1980 letter from a counselor at the Bureau of Rehabilitation in Traverse City, Michigan, indicates that throughout 1979 several attempts had been made to find employment for the Plaintiff consistent with his limitations. The counselor reports that Plaintiff had on-the-job training as an alcoholism counselor, but funding was discontinued. Employment as a restaurant manager was considered but that effort was unsuccessful. In addition several CETA positions were considered, but were not appropriate because of Plaintiff's back condition. In the opinion of this vocational counselor, "it appears from a rehabilitation standpoint that he will not be able to return to any gainful activity at this time based [sic] his medical condition...." (Tr 159).

The most conservative evaluation of Plaintiff's condition was that of Dr. Ingberg at the Rehabilitation Institute in Detroit. Dr. Ingberg's impression in June 1976, was that Plaintiff suffers a chronic cervical muscular contracture syndrome, and he suspected an emotional induced component, although he noted that there was no effort on Plaintiff's part to exaggerate his symptoms. In late 1976, Dr. Ingberg noted that he found no physical signs, and felt there was no way to proceed with psychiatric intervention, given Plaintiff's failure to admit of an emotional component. (Tr 124–126).

A vocational expert (VE) testified at the hearing, opining that Plaintiff's relevant work history included jobs ranging from light and unskilled work to heavy semi-skilled work. (Tr 50–51). Upon questioning by the ALJ, the VE testified that if Plaintiff could perform at the sedentary exertional level of work, then he would be capable of bench assembly, sorting, inspecting kinds of jobs, and jobs that would require clerical kinds of skills. (Tr 52–53). However, upon limiting Plaintiff's ability to do sedentary work to those jobs where there would be no prolonged stooping, bending, lifting and no repetitive motions of the head and neck on a sustained basis, the VE testified that Plaintiff would not be able to do the bench assembly, sorting and inspecting kinds of jobs. The VE went on to testify that Plaintiff has transferrable skills to clerical work in light of his 1979 employment which involved paperwork, and also given the requirements of Plaintiff's job as an engine analyst, in which he had to write up reports. (Tr 53).

The ALJ found that Plaintiff does suffer from a severe impairment in the form of a persistent cervical and lumbar spine strain (Tr 13), and that Plaintiff is unable to perform his past relevant work. (Tr 14). However, the ALJ found that Plaintiff has the residual functional capacity for sedentary work, and applying Regulation 404.-1513 and Rule 201.29 (Table No. 1 of App. 2, Subpart P, Reg. No. 4), found Plaintiff not disabled. (Tr 14). I find the ALJ's conclusion not supported by substantial evidence in the record considered as a whole, when Plaintiff's subjective testimony concerning his pain is viewed in light of the appropriate legal standards.

The ALJ's opinion indicates that he assumed any impairment must be shown by clinical and laboratory diagnostic techniques. He noted that functional limitations must be "medically determinable," and that this required an organic disfunction or other demonstrable cause. He then

quoted §§ 404.1508 and 416.908 of the Social Security Regulations as follows:

> ... your impairment must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms. (Tr 9–8).

After reviewing the medical evidence and noting that it suggests a physical basis for claimant's allegations of pain, the ALJ concluded that it did not support the alleged severity of the Plaintiff's pain. He noted, "the medical findings are such that they cast a question on claimant's credibility concerning the claimed degree of pain." (Tr 12). The ALJ went on to state:

> Even where, as here, there is some support for a level of pain/discomfort provided in the medical evidence, the actual degree of discomfort—and the functional effect(s) thereof—is highly subjective. In view of this and, also, of the fact that the testimony which claimant provides is highly self-serving and further subject to potential "modification" because of the factor of secondary gain which permeates this type of proceeding, one of the primary functions of the Administrative Law Judge (especially since he is the sole adjudicator to observe and interact with claimant) is to adjudge the degree of credibility which may be attached to the testimony. (Tr 12).

Although the ALJ's findings do not specifically reject the claimant's testimony concerning the severity of his pain, the ALJ's conclusion that claimant retains a functional capacity for sedentary work is at least in part based upon that evaluation of Plaintiff's testimony. I can only interpret the ALJ's evaluation of the evidence as applying an incorrect legal standard. The Sixth Circuit has long held that it is error to require that the existence of a condition must be established by objective medical, clinical or laboratory evidence.

*E.g., Nelms v. Gardner*, 386 F.2d 971 (CA 6 1967); *Ross v. Gardner*, 365 F.2d 554 (CA 6 1966). In this case the ALJ has apparently sought to discount Plaintiff's testimony about his pain by finding Plaintiff's testimony not entirely credible. In doing so on the basis that Plaintiff's testimony was subjective and self-serving, the ALJ would apparently always exclude a claimant's testimony about pain, on credibility grounds. An ALJ may not disregard a claimant's subjective complaints of pain solely because there exists no objective evidence in support of them, and it is insufficient for an ALJ to merely suggest conclusorily that complaints of back pain are not credible. *Streissel v. Schweiker*, 717 F.2d 1231 (CA 8 1983). While an ALJ may disbelieve a claimant's subjective complaints of pain, he or she cannot use the guise of credibility findings to undermine or circumvent the principle that subjective evidence of pain deserves serious consideration even though not fully corroborated by objective evidence. *Nettles v. Schweiker*, 714 F.2d 833 (CA 8 1983).

In this case, although the medical evidence does not reveal a neurological deficit or other similar injury, it is replete with clinical findings of pain, and often a limitation on Plaintiff's range of motion. The ALJ points to Dr. Ingberg's finding that nothing was "physically wrong" with the Plaintiff, but even Dr. Ingberg noted that Plaintiff complained of pain, and did not imply that Plaintiff was exaggerating his symptoms. On the whole, the ALJ's apparent suspicions of Plaintiff's credibility concerning allegations of pain stem from the lack of objective findings. That is not substantial evidence for a rejection of Plaintiff's subjective complaints of pain.

In fact, I find that the medical records as a whole indicate that Plaintiff continued to feel pain and tenderness in his neck and back, and Plaintiff's testimony indicates that the pain was indeed severe. He testified that he continues to wear a cervical collar when he sleeps, he takes pain medication in the night and in the morning, and has used a traction device; he incurred

disabling pain simply from doing the dishes; his activities are limited and he depends on his young children to do household tasks; and he has made several attempts to obtain employment or retrain for employment. Dr. Kelley's early records demonstrate Plaintiff's eagerness to return to work, and at least one physician noted that there was no exaggeration by the Plaintiff in terms of his symptoms.

The fact that Plaintiff attended a community college is not inconsistent with his testimony concerning the severity of his pain. Plaintiff explained that his course in traffic and transportation was a three hour class that met only one day a week, and that in one semester he took one or two classes that were just one hour long. (Tr 21). Plaintiff's volunteer work for Senior Citizens was likewise on a very limited basis, and Plaintiff had to quit a job in 1979 after six weeks, because of the pain involved. These facts are supportive of Plaintiff's complaints of pain, rather than inconsistent.

In addition to applying an incorrect legal standard to Plaintiff's subjective testimony, the ALJ erred in applying the vocational guidelines to reach a conclusion that Plaintiff is not disabled. The medical evidence clearly indicates that Plaintiff has substantial limitations. He must not engage in prolonged stooping, bending, lifting, the forceful use of the upper extremities particularly above the shoulder level, repetitive motions of the head and neck or sustained use of the head in a fixed position. (Tr 145–146). Clearly, the range of sedentary work which Plaintiff can perform is very limited. Under those circumstances, and in light of the pain experienced by Plaintiff, a non-guideline determination is required. *Kirk v. HHS,* 667 F.2d 524, 528–529 (CA 6 1981).

■ In this case the ALJ did receive the testimony of a vocational expert, who concluded that if Plaintiff was capable of sedentary work, clerical jobs existed in the national economy which could accommodate Plaintiff's functional limitations. However, the ALJ's hypothetical question to the vocational expert did not specifically take into consideration Plaintiff's pain, and did not include a restriction on activities involving the sustained use of the head in a fixed position.[4] For this reason, the vocational expert's opinion that Plaintiff could perform clerical work is defective and does not constitute substantial evidence. *See O'Leary v. Schweiker,* 710 F.2d 1334 (CA 8 1983). In fact, upon questioning by the Plaintiff's attorney, the vocational expert indicated that if Plaintiff had to stretch out on the floor and pull his knees to his chest, it would be frowned upon, and that if Plaintiff's pain caused him to be unable to deal with others about once a week, he would really be non-functioning. (Tr 54–56). Moreover, although the vocational expert testified that clerical positions would allow the option of sitting and standing, he noted that they would involve the option of walking around for only a few minutes. (Tr 54). Plaintiff's testimony was that he often needed to walk away for 10 or 15 minutes to relieve the pain, and that even this was not always effective.

To recover disability benefits under the Social Security Act, the burden of proof is on the claimant to show that a disability precludes him from engaging in any substantial gainful activity. However, a prima facie case is established if the claimant shows a medical basis for an impairment that prevents him from engaging in his particular occupation. *Garrett v. Finch,* 436 F.2d 15, 18 (CA 6 1970); *Hephner v. Mathews,* 574 F.2d 359, 361 (CA 6 1978).

■ It is well established that once a plaintiff has made such a prima facie showing, the burden of going forward with the evidence shifts to the Secretary to show that the claimant in his physical and mental condition, can perform other substantial gainful work, and that there are jobs in the national economy which claimant can per-

---

**4.** Nor did the VE or ALJ take into consideration the effect of Plaintiff's impaired vision in one eye on his ability to engage in "clerical work."

form. *Hephner v. Mathews, supra* at 362; *O'Banner v. Secretary of HEW,* 587 F.2d 321 (CA 6 1978); *Allen v. Califano,* 613 F.2d 139, 145 (CA 6 1980).

 Because the ALJ did not adequately take into consideration Plaintiff's complaints of pain, and because the vocational expert's opinion is not substantial evidence for a finding of no disability in this case, the Secretary's decision in this case must be reversed. Furthermore, because the record discloses no grounds for discounting Plaintiff's credibility, and that considering Plaintiff's pain he cannot fulfill the realistic requirements of even sedentary work, Plaintiff should be found disabled and an award of benefits should be made. The case will be remanded to the Secretary for that purpose.