**Margrett McGEE, Plaintiff,**

v.

**Otis R. BOWEN,\* Secretary of Health and Human Services, Defendant.**

**Kelly V. THOMAS, Plaintiff,**

v.

**Otis R. BOWEN,\* Secretary of Health and Human Services, Defendant.**

**Nos. 84 C 5093, 85 C 8149.**

United States District Court, N.D. Illinois, E.D.

Nov. 3, 1986.

\* Pursuant to Fed.R.Civ.P. 25(d), Otis R. Bowen is substituted as defendant in these actions. He succeeded Margaret Heckler, originally named as a defendant, as Secretary on December 6, 1985.

Frederick J. Daley, Chicago, Ill., for plaintiffs McGee and Thomas.

Anton R. Valukas, U.S. Atty., Chicago, Ill., Linda A. Wawzenski (No. 84 C 5093), Barbara F. Lazarus (No. 85 C 8149), Asst. U.S. Attys. (Donna M. Weinstein, Regional Atty., Dept. of Health and Human Services, Chicago, Ill., Barbara Braznell, Barbara M. King, Asst. Regional Attys., of counsel), for defendant.

## MEMORANDUM AND ORDER

MORAN, District Judge.

Both of these social security disability cases present issues of administrative *res judicata,* witness credibility and the role of expert opinion. Both claimants also ask to be evaluated under the new mental impairment listings, though for different reasons. Coincidentally, both claims also involve lost administrative records and reconstructed files. This court therefore treats them together in a single memorandum. For the reasons below, we reverse the Secretary in *McGee,* No. 84 C 5093, and award benefits, but uphold his denial of benefits in *Thomas,* No. 85 C 8149.

## BACKGROUND

### Claimant McGee

No one seems to know how many times Margrett McGee has applied for disability benefits under either Title II or Title XVI of the Social Security Act. In a Title II disability insurance benefits (DIB) claim filed September 18, 1979, she indicated two previous denials. That claim too was denied, apparently on *res judicata* grounds. None of these claims was pursued to the district court level. The instant case stems from a DIB claim filed on January 16, 1980. That claim was disallowed through the usual procedure up to the Secretary and she appealed to this court. Her file could not be located and the tape of her hearing was unusable, so after remand and another decision of the Appeals Council she got a new hearing before Administrative Law Judge (ALJ) Ed White on September 28, 1983.

Meanwhile, she had filed another DIB claim on February 19, 1982. Back on January 16, 1980, she had also filed an applica-

tion for Title XVI supplementary security income (SSI) benefits, which somehow got lost in the shuffle. While these matters were all pending she made three more SSI applications: November 16 and December 31, 1980, and June 14, 1982. The record also indicates that she had been found disabled in 1974 on an SSI application and was paid more than $8,000, which the Secretary now considers an overpayment due to her husband's income in that period. All of her DIB and SSI claims have, we hope, been consolidated into this appeal.

Ms. McGee's numerous applications rest on her mental disability, diagnosed repeatedly as chronic undifferentiated schizophrenia. There is no dispute that she is now disabled from it. Indeed, ALJ White found her disabled for purposes of her SSI claim, on which she cannot collect because her husband's income and resources exceed the specified amounts. Rather, the question which has dogged all of her DIB applications is whether she was disabled on or before June 30, 1964, when her Title II insured status expired. That status is based on the last job she was able to keep more than a few months: sanding automobile steering wheels at a rubber company.

The psychiatric division of Cook County Hospital committed Ms. McGee to Manteno State Hospital on June 12, 1963, where she remained until September 11, 1963. She was under supervision until April 16, 1964. She was again hospitalized at Manteno in June and July 1965, and in August 1968. According to her testimony she has been treated continuously at the Lawndale Mental Health Center since her first release from Manteno. Records substantiate that treatment from 1968, corresponding to the tenure of her current staff psychiatrist. Her mother and husband testified to, in the words of the ALJ, her "bizarre associations, autistic preoccupations, delusions and hallucinations," which correlates with the diagnosis of schizophrenia (R. at 13).

As is frequently true of schizophrenics, Ms. McGee has periods of remission of symptoms. Apparently during one of those periods she worked for a time as a maid at the former Sherman House Hotel; during another, as a janitress at a laundromat. She worked during the last three quarters of 1966, earning $907.21 for the year, and the first and third quarters of 1967, earning $394.68 (R. at 163). Dr. Leo Goldman, now a psychiatrist, testified that he treated her in and before 1963, when he was still a general practitioner, and recommended psychiatric care for her then. He further offered his expert opinion that in cases of her type partial remissions of symptoms lasting as long as a year could occur, but there was a nearly 100 percent probability of recurrence. Remission sufficient for long-term ability to work is "most unusual" (R. at 114).

ALJ White denied all Ms. McGee's DIB applications. He found that Ms. McGee had not submitted any new and material evidence which would justify reopening the 1979 or earlier applications. He therefore concluded that the matter of her disability prior to the expiration of her insured status was *res judicata* as to the 1980 and subsequent applications.

He also, however, apparently proceeded through at least four, if not all five, steps of the process of sequential evaluation of her DIB claim. *See Bowen v. City of New York*, 476 U.S. ——, ——, 106 S.Ct. 2022, 2025, 90 L.Ed.2d 462 (1986) (delineating the steps). For example, he expressly found that she had a severe impairment (step 2), schizophrenia, but that the impairment was neither listed in nor equal to one in the listing of impairments (step 3). He found her not capable of doing her past work, which is a step 4 determination, but described that past work as work in a laundromat and as a maid. Because she held those jobs in 1966–67, that step 4 determination could apply only to her SSI claim. For the DIB claim he found that thanks to the occasional remissions of symptoms, Ms. McGee had not been disabled for a period of twelve consecutive months at any time prior to June 30, 1964. In reaching that finding he relied heavily on the evidence of her earnings in 1966 and 1967, particularly noting that she worked during four consec-

utive quarters in that period. This evidence must have substituted for either a step 4 assessment of her residual capacity or a step 5 decision on her capacity to perform other work. In any case, whether he found her capable in 1964 of doing her past work (step 4) or other work (step 5), he concluded that she was not disabled at any time on or before June 30, 1964.

Ms. McGee contends that the ALJ erred in applying *res judicata* to her DIB claim and that there is good cause to reopen her earlier claims. She further contends that the decision that she was not disabled before June 30, 1964 is not supported by substantial evidence. Alternatively, she asks for a remand to be considered under § 12.03 of the revised mental impairment listings, 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.03 (1986). The Secretary contends that his application of administrative *res judicata* is not subject to judicial review, that the ALJ's decision is supported by substantial evidence, and that under the Disability Benefits Reform Act of 1984 Ms. McGee is not eligible for consideration under the new listings.

**Claimant Thomas**

Kelley Thomas first made a DIB application on June 12, 1980, claiming that he could not work due to uncontrolled high blood pressure and a slipped disc. He was found not disabled, which became the final decision of the Secretary after it was affirmed by the Appeals Council. He did not appeal. He then applied for SSI benefits on May 10, 1982, and made a second DIB application on January 13, 1983, claiming disability from angina pectoris and a herniated disc. The applications were consolidated for hearing before ALJ John Mondi. Since many of the exhibits from Thomas' first DIB claim had been lost, the file was reconstituted.

Thomas last worked in March 1979. He therefore ceased to be insured for DIB purposes as of June 30, 1981. ALJ Mondi found no new and material evidence relevant to his condition before that date and concluded that Thomas' DIB claim was *res judicata*. As to the SSI claim, Thomas submitted notes from a treating physician, Dr. Delgado, and an examining physician, Dr. Kline, briefly offering their opinions that he is unable to work. The record also contains an extensive consultative examination by Dr. Rabinowitz, which the ALJ summarized as follows:

The claimant complained of hypertension, chest pain, and joint pain. Although the claimant was taking Lasix, Propanolol, and supplemental potassium, persistent and significant systolic and diastolic hypertension were demonstrated by readings of 166/104 and 162/100 in the right arm, and 148/102 and 162/106 in the left arm. However, there was no obvious end organ damage—specifically no cardiac, renal, or neurologic impairment....

There is no history of prior myocardial infarction or coronary artery surgery. Dr. Rabinowitz noted that some of the features of the claimant's chest pain were consistent with angina. However, other features were not: specifically, the inconsistent relationship to exertion and location of the pain. A stress EKG revealed no significant diagnostic changes of ischemia. Additionally, no significant blood pressure alteration occurred. An occasional ventricular premature contraction was noted.... A resting EKG showing normal sinus rhythm, was assessed as within normal limits.

Physical examination further revealed decreased range of motion of the lumbar spine. Flexion was 80 degrees; extension was 30 degrees; and rotation to the right and left laterally was 20 degrees. However, X-rays of the lumbar spine were normal. Straight leg raising was positive at 60 degrees on the right and negative on the left. The claimant had no difficulty getting on and off the examining table, squatting, doing heel and toe walking, or ambulating without an assistive device. Gait was normal, and grip strength and digital dexterity were unimpaired. Neurologically, there was no evidence of nerve root irritation. The diagnostic impressions were essential hyper-

tension, poorly controlled; atypical chest pain with negative stress treadmill test and degenerative joint disease. (R. at 20.) Also, Thomas took an exercise treadmill test, which a state agency physician interpreted as being negative through completion of 10 METS and thus not indicative of severe cardiac impairment. *Id.*

ALJ Mondi found that Thomas is not engaged in substantial gainful activity and that he has severe hypertension, atypical chest pain and degenerative joint disease. However, these impairments were not medically equal to one in the listings. He then assessed Thomas' residual functional capacity. He found Thomas' testimony about his pain and functional limitations "overstated and less than credible in view of the absence of supporting objective findings" (R. at 22). Since the physicians who found disability did not support their conclusions with medical evidence, the ALJ focused on Dr. Rabinowitz' report. He determined that Thomas could lift up to 20 pounds at a time, operate arm or leg controls and walk, stand and sit for about six hours a day. He thus concluded that Thomas could not do his past work as an automation tender on an assembly line, but that he could perform the full range of light work (R. at 22). Since Thomas is 39, with a high school GED certificate, ALJ Mondi concluded that Thomas is not disabled. That decision is now the final decision of the Secretary.

Thomas now maintains that the DIB claim should not have been decided on *res judicata* grounds; that the SSI determination is not supported by substantial evidence, specifically in that Thomas' complaints of non-exertional impairments (headaches and dizziness) should have triggered the use of testimony from a vocational expert, and that Thomas' own complaints of pain were discounted; and that since Thomas' pain is out of proportion to his physical impairments, the ALJ should have on his own initiative considered the possibility of a mental impairment under the new listings. The Secretary again asserts that *res judicata* determinations are not

reviewable, that a vocational expert is not required in every case of non-exertional impairment, that the ALJ made a specific finding on Thomas' credibility, which is all that the law requires, and that the ALJ was not required to pursue a mental impairment question when the claimant himself had not raised it.

## DISCUSSION

### I. Res Judicata

The threshold question for both of these claimants is this court's ability to review the Secretary's use of *res judicata*. If his decision is indeed unreviewable, then we simply have no jurisdiction over either Ms. McGee's case or Thomas' DIB claim.

The merits of the Secretary's decision to apply *res judicata* are not before us. In *Califano v. Sanders*, 430 U.S. 99, 107–109, 97 S.Ct. 980, 985–86, 51 L.Ed.2d 192 (1977), the Supreme Court held that the Secretary's decision not to reopen a claim is not reviewable. Therefore, since the decision not to reopen and the decision to apply administrative *res judicata* to a subsequent claim are essentially two halves of the same decision, *see Blackburn v. Heckler*, 615 F.Supp. 908, 912 (N.D. Ill.1985), most courts which have considered the question have concluded that the Secretary's decision to apply *res judicata* is not reviewable either. *See, e.g., Burnett v. Heckler*, 625 F.Supp. 831, 835 (C.D. Ill. 1986); *Hennings v. Heckler*, 601 F.Supp. 919, 921 (N.D. Ill.1985).

That doctrine, however, is not quite the absolute barrier to review of claims that it appears to be. It does not follow that a court is thereby restricted to taking at face value the Secretary's assertion that preclusion was appropriate. *See McGowen v. Harris*, 666 F.2d 60, 65–66 (4th Cir.1981). The application of *res judicata* deprives the court of jurisdiction. Since a court always has jurisdiction to determine its own jurisdiction, it can make a minimal review to make sure that the Secretary's actions match his words. *McGowen*, 666

F.2d at 66; *Burnett,* 625 F.Supp. at 835–836.

■ For example, the Secretary's own regulations have modified the law of claim preclusion as it applies to the Secretary's decisions. *Purter v. Heckler,* 771 F.2d 682, 691 (3d Cir.1985). *Res judicata* may only be applied when the causes of action are the same. 20 C.F.R. § 404.957(c)(1), § 416.-1457(c)(1). The court can determine whether the Secretary followed the regulation. Thus it can compare the new claim with the old to ensure that in fact they involve the same impairment. *Purter,* 771 F.2d at 690–691; *Burnett,* 625 F.Supp. at 835. If they do not, the court can review the new claim.

■ Moreover, only a final judgment has preclusive effect. If the Secretary, acting through the ALJ, reopened the prior claim, then there is no final judgment to bar the new claim. *Taylor for Peck v. Heckler,* 738 F.2d 1112, 1115 (10th Cir.1984). Reopening may be constructive. Regardless of how the ALJ labeled his actions, if he in fact considered evidence and reached a decision on the merits of the claim, rather than simply finding the new claim precluded, then the old claim was reopened. *Purter,* 771 F.2d at 693; *Taylor,* 738 F.2d at 1114. If so, then a final judgment exists no longer, *res judicata* no longer is applicable, and the court may review the ALJ's decision as it would any other decision. *Purter,* 771 F.2d at 693; *Taylor,* 738 F.2d at 1115.

■ The ALJ can, of course, make enough use of the record to determine if *res judicata* is appropriate. Such use does not effect a constructive reopening. He may, and should, examine material used for the prior claim to determine if the claims are the same, and look at any newly submitted evidence to see if there is good cause to reopen. *Burnett,* 625 F.Supp. at 836. But he cannot proceed past that point to a decision on the merits. If he finds that the claims are the same, and nevertheless either reviews the old record or considers the new evidence in an evaluation of the merits of the claim, then the claim has been constructively reopened. *Purter,* 771 F.2d at 694–695; *Reinhart v. Schweiker,* 590 F.Supp. 78, 80 (W.D. Mich.1984).

Neither claimant here argues that *res judicata* was improperly applied because the claims were not the same, and we see no indication that they were not. The question of whether or not they were reopened, however, is another matter. Applying the above principles to the two cases before us, Ms. McGee's prior claim was constructively reopened, while Taylor's was not.

■ ALJ White expressly commented on and relied on old evidence, and made a determination on the merits that Ms. McGee was not disabled before her insured status expired. Probably he had little choice since the file had been lost, leaving him with no way to know precisely which items were part of the old record and which were not. Nevertheless, at a minimum, such items as Ms. McGee's 1966 and '67 earnings records and the records from her hospitalizations at Manteno must have been part of the former record. ALJ White discussed them both (R. at 13–15). He also relied on them in his decision, notably on the earnings as evidence of Ms. McGee's ability to work (R. at 15–16). Above all, though he said (R. at 14) that her status as not disabled within her insured period is *res judicata,* in fact he then proceeded to decide that question on the merits (R. at 16, finding 14). Therefore, he reopened her claim and we can review his decision.

■ ALJ Mondi, on the other hand, treated Taylor's former DIB claim much more restrictively. He mentioned its existence and its subject matter of high blood pressure and a slipped disc (R. at 19), which was necessary to a determination that the old and new claims were the same. However, he went no further. Despite the problem of a reconstituted file, he avoided proceeding to the merits. The only medical evidence he considered was that submitted subsequent to the decision on the first DIB claim (R. at 19). Likewise, he referred only

to testimony given at the current hearing. Since Taylor also brought an SSI claim at the same time, the ALJ made the findings necessary for a decision on that claim, but he refrained from commenting in any way on the extent of Thomas' disability in 1981 (*see* R. at 21–22). Thomas' 1980 DIB claim was not reopened. Since the Secretary denied benefits on that claim, and Thomas did not appeal, the Secretary may properly assert that denial as a bar to Thomas' 1983 DIB claim. This court may not review the denial of Title II benefits to Thomas.

## II. Witnesses and Experts

■ We turn to review of Ms. McGee's DIB claim and Thomas' SSI claim. The standard for grant or denial of disability benefits is the same for both Title II and Title XVI. The social security disability claimant who cannot demonstrate that she has a listed impairment establishes a *prima facie* case by showing that she cannot do the work she formerly did. It is then up to the Secretary to show that there is nevertheless work that she can do. In other words, the claimant has the burden of proof through the first four steps of the five-step inquiry, after which the burden shifts to the Secretary. *See generally Tom v. Heckler*, 779 F.2d 1250, 1252–1253 (7th Cir.1985). The Secretary's decision to grant or deny benefits must be supported by substantial evidence in the record as a whole. *Garfield v. Schweiker*, 732 F.2d 605, 607 (7th Cir.1984). "Substantial evidence" means that which a "reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). "In the record as a whole" means that the Secretary (here acting through the ALJ) cannot select only that evidence which supports his conclusion and ignore the rest. The evidence supporting the decision must still be substantial when all the evidence is weighed. *Taylor v. Schweiker*, 739 F.2d 1240, 1243 (7th Cir. 1984).

Ms. McGee's claim is the more difficult to evaluate since we cannot tell precisely what ALJ White did. Ms. McGee did not work in 1964. To find her not disabled for twelve consecutive months before June 1964, he must first have made a finding that at some point during that time span she was not disabled. In making that finding, we know that he found her work in 1966 to 1967 decisive. We do not, however, know whether he concluded that because she was a maid in 1966 she could have sanded steering wheels in 1964, so that she failed to meet her burden in step 4, or that because she was a maid in 1966 she could have been a maid in 1964, so that the Secretary met his burden at step 5. Thus we review both possibilities. ALJ Mondi expressly found that Thomas could not do his past work, so the question for the SSI claim is only whether the decision that he could still do other work is supported by substantial evidence.

In Ms. McGee's claim, questions arise about ALJ White's handling of the testimony from herself and her family that she could not work in 1964, and of the psychiatric evaluations that have reached the same diagnosis for her from 1963 until the present. Thomas disputes ALJ Mondi's findings in the face of his own testimony about his pain, headaches and dizziness, and in the face of two physicians who found him unable to work.

### A. Credibility of Lay Witnesses

■ An ALJ's determinations about the credibility of lay witnesses are entitled to considerable weight. *Bibbs v. Secretary*, 626 F.2d 526, 528 (7th Cir.1980). However, to reject testimony—either the claimant's, or that of another lay person such as a member of the claimant's family—the ALJ must specifically conclude that the testimony is not credible. *Orlando v. Heckler*, 776 F.2d 209, 213 (7th Cir.1985). He must also provide a "minimal level of articulation" of his reasons for finding lack of credibility. *Zblewski v. Schweiker*, 732 F.2d 75, 79 (7th Cir.1984); *see also Munks v. Heckler*, 580 F.Supp. 871, 874 (N.D. Ill. 1984).

ALJ White heard testimony from Ms. McGee, her husband and her mother about the frequent recurrence of Ms. McGee's symptoms continuously from 1961 until the present. He found Ms. McGee "less than candid" about how often she worked in 1966–67 (R. at 15), but he did not say whether or not her description of her symptoms was believable. He made no comments at all about the credibility of the husband or the mother. He nevertheless found Ms. McGee was not disabled in 1964, which cannot be squared with their testimony. If his decision was that Ms. McGee did not make out a *prima facie* case, the missing conclusion on credibility and reasons for such conclusion would appear to require at least a remand. *Cf. Munks,* 580 F.Supp. at 874 (no reason given for rejecting testimony of claimant's wife).

■ ALJ Mondi specifically found Thomas' testimony about his symptoms and functional limitations "overstated and less than credible" (R. at 22). Further, he said why: because the objective evidence, particularly the medical evidence, did not support the testimony. (*Id.*) Such a "minimal articulation" meets the standard in this circuit. *Zalewski v. Heckler,* 760 F.2d 160, 166–167 (7th Cir.1985); *accord Landry v. Heckler,* 782 F.2d 1551, 1554 (11th Cir. 1986). Witness credibility problems provide no ground for changing Thomas' SSI result.

**B. Expert Opinion**

■ An ALJ is not an expert in either medical or vocational matters. His conclusions therefore are limited to some extent to those which have support in the record from persons who are experts. In medical matters, for example, he may discount a physician's conclusory statement which is not supported by acceptable clinical and laboratory techniques for making diagnoses. *Strunk v. Heckler,* 732 F.2d 1357, 1362 (7th Cir.1984). When well supported expert opinion is in conflict, he may give one expert's conclusion more weight than another's. *Stephens v. Heckler,* 766 F.2d 284, 288–289 (7th Cir.1985). But he cannot decide on his own the meaning of medical tests which require expert interpretation, *Whitney v. Schweiker,* 695 F.2d 784, 788 (7th Cir.1982), and he cannot make his own independent medical determination of the plaintiff's condition. *Rousey v. Heckler,* 771 F.2d 1065, 1069 (7th Cir.1985). In short, he cannot reach a medical conclusion unsupported by reliable expert testimony.

■ In determining whether ALJ White's decision kept within those limits, we are again handicapped by the lack of clarity about what he did. Certainly Ms. McGee presented expert opinion tending to show that she was disabled in 1964. Dr. Goldman testified as to what he could remember of Ms. McGee's condition in the pre–1964 period and gave his expert opinion about the unlikelihood of recovery from such a condition. In 1963 Ms. McGee was hospitalized, and was still under observation as late as two months before June 30, 1964. There is simply no medical opinion in this record which would affirmatively indicate that Ms. McGee was capable of working in 1964, unless it would be her discharge from Manteno. But when the impairment is mental, it is well established law "that release from an institution does not in and of itself establish that an impairment no longer exists." *Rivera v. Schweiker,* 560 F.Supp. 1091, 1097 (S.D.N. Y.1982). Many persons who need not be institutionalized for their own or society's protection are nevertheless mentally incapable of working. The mere fact of release, when weighed against the family's testimony, the Manteno diagnosis and Dr. Goldman's opinion, does not appear to constitute substantial evidence to support a conclusion that Ms. McGee could return to her past work in 1964.

■ ALJ Mondi, however, kept within the range set by the experts. True, two physicians found Thomas unable to work, but Dr. Delgado's two-sentence note on a sheet from a prescription pad was unsupported by findings. Dr. Kline, a chiropractor, based his conclusion on his reading of an X-ray. His diagnosis, however, was merely grade 2 invertebral disc syndrome

and sciatica. His one-page report did not elaborate on whether he thought Thomas was disabled from all work or just his past work. ALJ Mondi instead relied on Dr. Rabinowitz, who supplied a four-page evaluation and another ten pages of data, and on the interpretation of a treadmill test. These experts found impaired mobility but not immobility, and hypertension but no end organ damage. This evidence provides substantial support for the conclusion that Thomas could do light work.

Thomas also objects to an absence of expert testimony. Non-exertional impairments, such as Thomas' claimed sensations of pain, headaches and dizziness, do not appear in the Medical-Vocational Guidelines ("the grid"), 20 C.F.R. Part 404, Subpart P, Appendix 2 (*see* § 200.00(e)). When a claimant has nonexertional impairments, frequently the testimony of a vocational expert is needed to determine whether jobs exist which the claimant can perform even with the impairment. *Warmoth v. Bowen,* 798 F.2d 1109, 1112 (7th Cir.1986). Thomas argues that ALJ Mondi erred in not calling such an expert.

 The ALJ's decision was adequate, however, on either of two grounds. First, as noted above, he found Thomas' account of his non-exertional impairments exaggerated. This is not surprising, since Thomas denied that he suffered from headaches and dizziness when examined by Dr. Rabinowitz (R. at 166), but changed his description of himself at the hearing to include those systems (R. at 39). An ALJ need not follow up on items raised by testimony which he does not consider credible. Second, a vocational expert is not required in every case in which a nonexertional impairment appears. Only when medical evidence indicates a likelihood that the non-exertional impairment could be disabling, or substantially reduces the range of work available without aggravating the impairment, is an expert on job availability needed. *Warmoth,* 798 F.2d at 1112; *Nelson v. Secretary,* 770 F.2d 682, 685 (7th Cir.1985). The ALJ found neither of those conditions present in Thomas' case and we cannot

fault that finding. ALJ Mondi did not need to call a vocational expert.

## III. Hindsight Evidence

If ALJ White's decision that Ms. McGee was not disabled in 1964 was a step 4 decision, this court must remand it. To reach the conclusion that she had not made out a *prima facie* case of disability, he would have had to ignore basic principles for dealing with witness credibility and expert opinion. We therefore consider it more likely that he made his decision at step 5. He could have found that the evidence of her working in 1966–67, plus the 1963 discharge from the hospital and evidence of remissions, established that she was capable of doing other work in 1964. If so, then he could have considered the step 5 evidence so persuasive that it was simply unnecessary to reach the question of whether she had met her burden at step 4. Such an interpretation fits the language of the decision and we assume that is what he did.

 However, the evidence on which he relied is hindsight evidence. He concluded that because she worked in 1966 she was not disabled long enough in 1964 to meet the duration requirement of 42 U.S.C. § 423(d)(1). When the question is whether a disability satisfies the duration requirement, evidence that the applicant managed to work for a time after the onset of disability does not necessarily prove that the applicant was never disabled within the meaning of the statute. As the Seventh Circuit has recently reiterated, the question under the statute is not whether the claimant became permanently disabled, but rather whether she suffered from a disability which reasonably was expected to last for twelve consecutive months. An applicant who attempts to return to work, and even does so successfully for a short period, does not by that attempt lose all claim to benefits. *McDonald v. Bowen,* 800 F.2d 153, 157 (7th Cir.1986).

Indeed, even a fully successful return to work after a period of disability does not of itself mean that the disability never exist-

ed. In *Monteiro v. Heckler,* 641 F.Supp. 363 (S.D.N.Y.1986), an applicant claiming he was disabled in 1982 had surgery in 1983 which, against all expectations, cured his disability. His recovery did not mean that he was not disabled in 1982, nor that the disability was not then expected to be long term. He was awarded benefits for the period of over a year during which he was disabled. 641 F.Supp. at 365 n. 2, 367. Similarly, Ms. McGee's employment in 1966 does not require the conclusion that she was employable in 1964.

■ Moreover, as with any other type of evidence, the ALJ cannot simply pull out the evidence from hindsight which supports denial and pass over similar evidence which supports the opposite result. Evidence and diagnoses from many years after the expiration of insured status are both admissible for and relevant to a determination of disability before the status expired. *Stark v. Weinberger,* 497 F.2d 1092 (7th Cir.1974). In *Stark,* a claimant proved that she had been disabled in 1950 on the basis of medical reports from 1957, 1960 and 1971, plus testimony from lay persons, two of whom had observed her from about 1940 on, and one from 1955 to 1958. Evidence of her medical condition after 1950, coupled with the lay observations of her before then, and expert testimony about the usual course of her disease and unlikelihood of a cure, supported inferences about her condition before 1950. 497 F.2d at 1097; *accord Parker v. Harris,* 626 F.2d 225, 232 (2d Cir.1980); *Gold v. Secretary,* 463 F.2d 38, 41–42 (2d Cir.1972). *See also Guzman v. Bowen,* 801 F.2d 273 (7th Cir.1986) (mental impairment established through IQ test taken after expiration of insured status). Ms. McGee's hindsight evidence supporting her claim is similar to that of the claimant in *Stark,* since she presents repeated identical diagnoses from 1965 on and Dr. Goldman's expert opinion about the expected persistence of her condition, plus the Secretary's own findings of her disability as of 1974 and of 1980. Taking the evidence of her later employment in the context of all the other evidence from hindsight, one still

doubts that the ALJ's decision is supported by substantial evidence.

Having reached that point in our analysis, the usual course would be to remand the case to the Secretary for reevaluation of his position. However, Ms. McGee filed this claim in 1980 and it is still pending in this court in 1986, largely through no fault of Ms. McGee. A remand would mean even more delay. We can reach an outcome now—and, incidentally, discover how and why ALJ White reached the conclusion he did—by turning to the last question both claimants have raised: whether their cases should be judged under the new mental impairment listings.

## IV. Standards for Mental Impairments

### A. Pain and Mental Disability

ALJ Mondi found that Thomas' complaints of pain were significantly out of proportion to any medically demonstrated physical problems that could be causing the pain. Thomas contends that the ALJ erred because he should then have proposed, on his own, a psychiatric evaluation, since disproportionate experience of pain can be a symptom of mental illness. Alternatively, Thomas supplies a psychiatrist's preliminary evaluation obtained after his hearing and urges a remand for consideration of this question.

■ If it had occurred to ALJ Mondi that Thomas' pain might stem from an emotional disorder, investigation of that possibility was within his powers. An agency ruling authorizes consideration of a severe mental impairment when an applicant complains of symptoms and no medically determinable physical impairment is found. Soc.Sec.Rul. 82–58, [1982–83 Transfer Binder Soc.Sec.] Unempl.Ins.Rep. (CCH) ¶ 14,358 at 2499–49 (1982). However, the same ruling notes that "the fact that an individual may seem to be exaggerating the limitations arising from a symptom does not necessarily mean that the symptom or the alleged functional limitation is in any way the result of an emotional disorder." *Id.* at 2499–50. Perhaps if

the testimony or evidence in a disproportional pain case strongly suggested a mental impairment, and the applicant's attorney had asked for a consultative psychiatric examination, an ALJ might err by failing to order one. *See McGee v. Weinberger*, 518 F.2d 330 (5th Cir.1975); *Padilla v. Heckler*, 643 F.Supp. 481 (S.D.N.Y. 1986). However, an ALJ is not required to consider the possibility of a psychological basis for pain when, as here, neither the claimant nor his attorney raised the issue and no medical evidence suggests it. *Bishop v. Weinberger*, 380 F.Supp. 293, 297 (E.D. Va.1974); *and see Turner v. Califano*, 563 F.2d 669 (5th Cir.1977). The ALJ did not err.

■ Thus, to order a remand for consideration of any possible mental impairment we would need to find both that the psychiatrist's "preliminary evaluation," which Thomas now presents, constitutes new and material evidence, and that good cause exists for Thomas' failure to submit it to the ALJ. *See* 42 U.S.C. § 405(g). The "evaluation" consists of notice that Thomas took the Millon Clinical Multiaxial Inventory and a one-paragraph description of personality traits of persons who score at the level Thomas did on that test. In essence, it says that Thomas is likely to be "touchy," to anger easily, to resent attempts to control his life, and to be suspicious of others. The psychiatrist does not say how that condition could create an experience of a high degree of pain. Absent some connection to Thomas' pain, the report is not material. *See, e.g., Cotton v. Bowen*, 799 F.2d 1403, 1409 (9th Cir.1986). Thus Thomas has no grounds for remand.[1]

## B. Confusing Duration and Severity

Ms. McGee asserts that her claim should be remanded for consideration under the new mental impairment listings for a different reason. Her goal is to take advantage of such phrases in those listings as

"medically documented persistence, either continuous *or intermittent*, of [psychotic symptoms]." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.03(A) (1986) (emphasis added). She argues that the ALJ refused to find her disabled during the appropriate time period solely because she had periods of partial remission during which she regained some normal functions, including the ability to work for some periods during 1966–67. These remissions kept her from demonstrating a continuous twelve-month period of disability. The new standards distinguish between remission and recovery, so that constant psychotic symptoms for twelve straight months are not required before a claimant can be found disabled.

Ms. McGee's case, however, falls between two stools under the Social Security Disability Benefits Reform Act of 1984. Under § 5(c)(1) of that Act, Pub.L. 98–460, 98 Stat. 1801–1802, automatic redetermination of a mental impairment claim under the new standards is required only for claims which were denied initially, in reconsideration or on hearing during the period between the Act's enactment (October 9, 1984) and the issuance of the new standards (August 28, 1985). Section 5(c)(3) of the Act makes mental impairment claimants found not disabled by an initial disability determination on or after March 1, 1981 eligible for redetermination, but only if they reapply for benefits within a year of the date of enactment. The claim which is before the court, the Secretary points out, received its initial determination well before March 1, 1981, having gone to the hearing stage by April of that year. Further, Ms. McGee did not reapply for benefits between October 1984 and October 1985. On the other hand, the claim is not eligible for automatic redetermination since even the most recent denial at the hearing stage came on December 12, 1983, long before October 1984. She cannot benefit from the new standards.

---

1. Should Thomas learn more about his condition that would indicate a relation to his pain, he can reapply for benefits. Since a claim grounded on mental impairment would not be the same claim as his current one involving his back and heart, *res judicata* would not bar it. *See McGowan*, 666 F.2d at 67.

However, she does not need the new standards to get the law she wants. A showing of continuous psychotic symptoms for twelve consecutive months has never been a requirement for a finding of disability by reason of mental impairment. *Miller v. Heckler,* 747 F.2d 475, 478 (8th Cir.1984). In the words of the Fifth Circuit, an ALJ who imposes such a requirement "confuses the duration requirement, which applies only to the impairment, with the severity requirement...." *Singletary v. Bowen,* 798 F.2d 818, 821 (5th Cir.1986). The requirement that an impairment last or be expected to last for a continuous period of twelve months means only that the impairment must be "a long-term problem and not just a temporary setback." *Id.* at 822. A mental impairment which "manifests itself from time to time over a long-term period" satisfies that requirement. *Id.; see also Dreste v. Heckler,* 741 F.2d 224, 226 n. 2 (8th Cir.1984). Evidence that a mentally impaired claimant has periods of remission from symptoms is relevant to the severity of the impairment, but does not of itself determine how long the impairment is likely to last.

ALJ White confused the duration requirement with the severity requirement. A claimant "does not have to show a twelve-month period of impairment unmarred by any symptom-free interval." *Singletary,* 798 F.2d at 821; *accord Miller,* 747 F.2d at 478; *Lebus v. Harris,* 526 F.Supp. 56, 61 (N.D. Calif.1981). Indeed, even the fact that a claimant has worked for part of the twelve-month period does not necessarily negate a finding of disability. The question is not whether the claimant could get and physically perform a job during a period of remission, but rather whether the claimant could hold a job for any significant length of time. *Singletary,* 798 F.2d at 822; *Miller,* 747 F.2d at 478.

ALJ White, however, in deciding that Ms. McGee was not disabled, emphasized the relative shortness of her periods of hospitalization, her remissions, and above all the evidence that she was able to work for periods in 1966 and 1967 (R. at

13–15). He expressly grounded his finding that she failed to establish disability on "evidence of the claimant's work activity after October 15, 1963" (R. at 16). His decision thus is not only not supported by substantial evidence, it rests on an error of law.

## C. Duration

Applying the correct standard and considering the record as a whole, both pre–1964 evidence and all the hindsight evidence, the conclusion that Ms. McGee in 1964 had an impairment which would have been reasonably expected to cause her long-term problems is inescapable. For one thing, the expert opinion, uncontradicted on this record, is that persons with her condition have remissions but are not expected to recover. For another, thanks to hindsight we know she did not recover. She was hospitalized again in 1965 and 1968. She has been under treatment at a local mental health center since at least 1968. The Secretary found her disabled for SSI purposes as of 1974 and again as of 1980. In short, she was ill in 1963 and remains ill from the same disease today. Her impairment caused her long-term problems. It satisfies the duration requirement.

## D. Severity

The only question, then, is whether her impairment was of sufficient severity in 1964 to be disabling. Her periods of remission are relevant to this inquiry. ALJ White emphasized her ability to work in 1966–67. But that evidence is not decisive even for severity. In *Stark,* the claimant had worked during five of the first eight years after her insured status had expired. The court held that the proper question was whether, given the state of her disability, she should have been expected to work. It found that she should not have been. 497 F.2d at 1095, 1098. *See also Prill v. Schweiker,* 546 F.Supp. 1381, 1388 (N.D. Ill.1982) (epileptic seizures); *Tunstall v. Schweiker,* 511 F.Supp. 470, 474 (E.D. Pa. 1981) (blackouts). For a mentally ill claim-

ant, the analogous question is whether she could then have reasonably been expected to hold a job for any significant length of time. *See Singletary,* 798 F.2d at 822; *Miller,* 747 F.2d at 478. *Cf. Rivera,* 560 F.Supp. at 1097.

So posed, the question virtually answers itself. Nine months before June 30, 1964, Ms. McGee was still in Manteno, and a year later she was back in Manteno again. Every medical opinion about Ms. McGee before and after June 1964 has reached the same diagnosis of chronic undifferentiated schizophrenia. The logical inference is that in June 1964 she had chronic undifferentiated schizophrenia. No expert opinion suggests otherwise.

As a sufferer from severe schizophrenia, she could not be expected to hold a job. *See, e.g., Dennis v. Heckler,* 756 F.2d 971 (3d Cir.1985); *Markoff v. Heckler,* 626 F.Supp. 1074 (D.Mass.1986). The evidence that she worked in 1966 and 1967 is not proof that her disease was not disabling. Her earnings, $1301.89 over two years, hardly compel a conclusion that she had overcome her disability, even during those years. Instead, they are consistent with what we know about her disability, *i.e.,* that periods of remission occur. In *Dennis,* a claimant was found disabled despite an eight-year period of partial remission. In that case, as here, the psychiatric testimony uniformly diagnosed the claimant as a chronic schizophrenic. The court found him unable to keep a job despite some ability to function in society. 756 F.2d at 976. Ms. McGee's ability to work for a time must be weighed in light of the whole record, including the fact that both before and after 1966–67 she deteriorated to the extent that she was hospitalized, including the testimony of her family as to her condition throughout the period, and including the expert opinion on the likelihood of recurrence of symptoms at any time. We agree with *McDonald,* 800 F.2d at 158, and *Stark,* 497 F.2d at 1100, that the statute does not require punishing those who try to work in spite of a disability with loss of their benefits. *Cf.* 20 C.F.R. § 404.1592

(allowing trial work period without loss of claim to benefits).

Once the proper legal standard for mental disability is applied to this record, it can only support the conclusion that Ms. McGee was disabled in 1964. She established that she was then a schizophrenic with disabling symptoms whose frequency could not be predicted. Arguably, she then had a listed impairment even under the old listings, which included "manifested persistence of ... hallucinations or delusions ... or autistic or other regressive behavior ... [and] resulting persistence of marked restriction of daily activities and constriction of interest and deterioration in personal habits and seriously impaired ability to relate to other people." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.03 (1984). *See Benedict v. Heckler,* 593 F.Supp. 755, 759 (E.D.N.Y.1984). At a minimum, she met her burden of showing that she could not then keep a job at her past relevant work. The burden then shifted to the Secretary to show that there are jobs which a schizophrenic could not only get but hold. We doubt that the Secretary could make such a showing. *See Rivera,* 560 F.Supp. at 1096, 1100–1101. In any case, he did not. In fact, no substantial evidence of any sort appears in this record on that subject, once her work in 1966 to 1967 is given the proper weight. The Secretary did not meet his burden and Ms. McGee is entitled to benefits.

## CONCLUSION

The Secretary's motion for summary judgment is granted in *Thomas,* No. 85 C 8149, but denied in *McGee,* No. 84 C 5093. Plaintiff McGee's motion for summary judgment in No. 84 C 5093 is granted. The decision of the Secretary in that case is reversed and the Secretary is directed to establish a period of disability and award the benefits owed.