Mary GOSSETT, Plaintiff,

v.

Shirley S. CHATER, Commissioner
of Social Security,* Defendant.

No. IP 94–1232–C (B/S).

United States District Court,
S.D. Indiana,
Indianapolis Division.

Oct. 18, 1996.

---

* Pursuant to section 109(b) of the Social Security Independence and Program Improvements Act of 1994, Pub.L. No. 103–296, § 109(b), 108 Stat. 1465 (codified at 42 U.S.C.A. § 901, historical & statutory notes (West Supp.1995)), Shirley S. Chater, the Commissioner of Social Security, is substituted as the named defendant-appellee for Donna E. Shalala.

Jeffrey Burris, Indianapolis, IN, for Plaintiff.

Gerald Coraz, Assistant United States Attorney, Indianapolis, IN, for Defendant.

## ADOPTION OF MEMORANDUM DECISION AND JUDGMENT

BARKER, Chief Judge.

Magistrate Judge V. Sue Shields submitted her Report of Review, Recommendation and proposed Memorandum of Decision which reads as follows:

(H.I.)

The Commissioner has filed objections to the Magistrate Judge's Report of Review and Recommendation. The court has considered the Commissioner's objections and finds that each of the arguments made therein was addressed and properly decided by the magistrate judge in her proposed Memorandum of Decision. Accordingly, the court approves and adopts the Magistrate Judge's Report, Recommendation and Memorandum of Decision as that of the court.

IT IS, THEREFORE, CONSIDERED AND ADJUDGED that the Commissioner's decision in this cause is **ORDERED REMANDED** to the Commissioner for further proceedings and a de novo determination.

## *MAGISTRATE JUDGE'S REPORT OF REVIEW AND RECOMMENDATION*

SHIELDS, United States Magistrate Judge.

Magistrate Judge V. Sue Shields, having considered the plaintiff's complaint for judicial review of a final decision of the Commissioner of Social Security, defendant's answer, plaintiff's motion for judgment on the evidence and memorandum of law, defendant's brief in support of the Commissioner's decision, plaintiff's reply brief, and the record of the proceedings before the Administrative Law Judge, and being duly advised, makes the following recommendation.

## I. *PROCEDURAL HISTORY*

Mary Gossett filed an application for Social Security Disability Benefits (DIB) on August 13, 1991, alleging that she became disabled on November 1, 1988. Record at 129. Gossett's application was initially denied on October 29, 1991. *Id.* at 133. A disability hearing before an Administrative Law Judge (ALJ) took place on August 19, 1992, *id.* at 15, and a supplemental hearing was held on August 19, 1992. Gossett was represented by counsel at both hearings.

The ALJ denied Gossett's request for DIB on January 4, 1993. After a remand from the Appeals Council, a third hearing was held on January 3, 1994. *Id.* at 316. Gossett's request for disability was again denied by the ALJ on April 29, 1994. *Id.* at 12. The ALJ found that claimant was unable to perform her past relevant work, or any work "requiring extensive use of near vision or reading"; however, due to her education, age, work experience, and residual functional capacity, there were a significant number of alternative jobs in the national economy that Gossett could perform. *Id.* at 34. The Appeals Council denied Gossett's request for review on June 30, 1994. *Id.* at 6–8. Therefore, the ALJ's decision stands as the final decision of the Commissioner.

## II. *EVIDENCE PRESENTED BEFORE THE ALJ*

A. *Testimony Before the ALJ*

Gossett testified that she was born on October 4, 1955. *Id.* at 59. She holds a B.S. in Computer Science and a B.A. in Anthropology. *Id.* at 60. She last worked full time as a systems analyst and computer programmer on November 1, 1988. *Id.* She then went on medical leave, returning to work for approximately nine weeks on a part-time basis from April until July 1990. *Id.* at 60–61. During

this period, Gossett worked from six to nine hours per week, but she found that her "eyes just weren't up to it anymore," so she quit. Her employment was officially terminated on November 1, 1990. *Id.* at 62.

Gossett testified that she had difficulties with her vision that stem from a return of exotropia from her childhood. *Id.* at 64. She said that her left eye tended to turn outward, making it difficult to fuse images, thus producing double vision. To solve this problem, she covers the left lens of her glasses. *Id.* at 65. She testified that without her glasses she could see clearly only three or four inches from her face. *Id.* at 66. When she wears her glasses her eyes hurt; the pain increases, and her vision worsens, the longer she wears her glasses. *Id.* at 65. Continuous use of either her eyes or glasses causes severe headaches and nausea, and she can wear her glasses for only about two hours before becoming "really sick." *Id.* at 70, 71. She testified that she wears glasses without a prescription and with her left eye covered for reading, and she experiences eye fatigue after about an hour of reading with those glasses. *Id.* at 72. To avoid these problems, she spends most of her time at home without her glasses on, wearing them only when necessary for safety purposes or to perform a certain task. *Id.* at 66. When she uses her eyes too much, she must lie down in a totally dark room for thirty minutes and do exercises to help rest her eyes. *Id.* at 72. The day after using her eyes too much, she is unable to wear her glasses at all without immediately experiencing vertigo, nausea, and eye pain. Therefore, she plans her activities so that "if I know something is going to use up a certain amount of eye power, then I can't ... do anything for the next few days that's going to require that kind of work." *Id.* at 73. Gossett further testified that she believes her psychological problems, specifically her "high degree of stress," contribute to her eye problems. *Id.* at 67.

When questioned about her daily activities, Gossett testified that she cooks daily and does laundry and other household chores, all without wearing her glasses. *Id.* at 74. When cleaning, she does "a normally adequate job" without her glasses, then puts her glasses on to see if she has missed anything. *Id.* at 259. She also drives herself to the grocery store where she does the shopping. She testified that driving was "the hardest thing that I could do on my eyes." *Id.* at 76. After driving to the store, she rests her eyes for approximately ten minutes before doing her shopping. She rests her eyes several times while in the store. Upon arriving home, she puts away her refrigerated items, then lies down to rest her eyes for twenty or thirty minutes before putting away the remainder of her groceries. *Id.* at 257–58.

At her supplemental hearing, which took place pursuant to an Appeals Council remand, Gossett was asked if she had been examined or treated for problems with either bilateral manual dexterity or peripheral visual field. She testified that she had not had any formal testing of her bilateral manual dexterity, but that she felt she had become "a lot more clumsy" and prone to dropping things over the previous year and that she had mentioned this to Dr. Pourmand, whom she had seen at a muscular dystrophy clinic. *Id.* at 127. She testified that Dr. Pourmand had determined that she did not have any muscle disease, but had sent her to a chronic fatigue syndrome clinic, where she had seen Dr. Goshorn. *Id.* at 122–23. Dr. Goshorn had determined that Gossett did not have chronic fatigue syndrome, and opined that her fatigue was due to her depression. *Id.*

As for her visual field problem, Gossett stated that "it's not real relevant when I don't have my glasses on because my vision is so poor anyway. When I wear my glasses, the prescription is so strong that I don't have much peripheral vision with my glasses on anyway.... So I have not pursued that with anyone ... I've not been tested for it." *Id.* at 127.

Gossett's husband, Lynn Gossett, testified that it takes Gossett longer to do household chores because of her eye problems and that she tires much more easily. *Id.* at 81, 83. He also stated that she suffers from severe headaches approximately three or four times a week, and that often when he comes home from work she is lying in a dark room resting her eyes. *Id.* at 80.

B. *Medical Evidence Regarding Ophthalmological Impairments*

On June 15, 1988, Gossett saw ophthalmologist Eugene Helveston on referral from her usual ophthalmologist. Gossett was complaining of diplopia and asthenopia (eye pain), especially in near vision. *Id.* at 229. Her symptoms were aggravated by her computer work. *Id.* at 233. Dr. Helveston determined that Gossett's visual acuity was 20/25 in both eyes, as corrected by contact lenses. *Id.* He noted that she had poor fusional amplitudes and poor convergence. He reported to her family doctor that Gossett "is going to be a difficult manage problem" and recommended conservative treatment of her symptoms, consisting of convergence exercises and the use of prism glasses. *Id.* at 233.

Gossett was again seen by Dr. Helveston, and/or his partner, Dr. Ellis, on September 21, 1988, October 20, 1988, and October 31, 1988. Her symptoms had remained unchanged, but the doctors noted some improvement in her exodeviation. *Id.* at 229.

Gossett underwent eye surgery on February 2, 1989, consisting of a 4 millimeter bimedial rectus resection in both eyes. Postoperatively, Gossett's eyes were straight to slightly esotropic (inwardly deviated). *Id.* Her distant visual acuity with her contact lenses was 20/40. Her ability to fuse objects was diminished, and Dr. Helveston noted exodeviation of an intermittent 6 at near with her glasses. *Id.* In a summary report addressed to Gossett and dated March 28, 1989, Dr. Helveston concluded:

> In summary, at the present time you are having severe symptoms mostly at near vision. This is interrupting your ability to concentrate and of course, to work effectively.
>
> I am at a loss to equate your physical findings with the subjective findings that you are experiencing. I certainly appreciate and am sympathetic with the problems that you are having. However, the objective eye findings that we are able to uncover do not entirely match your subjective complaint.
>
> In view of the fact that you are having a great deal of difficulty, I think that it will be difficult for you to work. With regard to substantiating objective findings for longterm disability, that will be hard for me to do.
>
> For now, it would be best for you to remain off work. I hope that your symptoms will improve significantly and I hope that you will be able to return to work. In my opinion, it will be possible for you to work with the state of eye health that you now have. I hope that these problems that you are now having will resolve soon.

*Id.* at 230.

Dr. Helveston saw Gossett again on May 1, 1989, and on a physician's statement to Canada Life, Gossett's long term disability carrier, he reported a primary diagnosis of intermittent exotropia and convergence insufficiency, with subjective symptoms of asthenopia. Her treatment consisted of using prism glasses and doing orthoptic exercises. He opined that Gossett was a suitable candidate for part-time employment on a trial basis beginning in September 1989, but noted that she should avoid sustained visual tasks. Dr. Helveston also remarked that "Mary is having significant and disabling visual symptoms related to nearly all near vision tasks. These have been unresponsive to optical, prismatic, surgical, and orthoptic therapy." *Id.* at 281–82.

In a report addressed to Gossett and dated August 14, 1990, Dr. Ellis, Dr. Helveston's partner, noted that he had examined Gossett on July 25, 1990. *Id.* at 226. While wearing a high myopic spectacle correction, her vision was 20/30–2 in the right eye and 20/40–2 in the left eye; at near she could read 20/20. Exotropia and left hypertropia were measured in all gaze positions. Dr. Ellis noted that: "We had a long discussion at the time of your last visit and I told you that I do not believe you can ever be free of ocular discomfort. I would suspect that you will always have the type of ocular symptoms we describe as asthenopia." *Id.* at 226.

In September, 1991, Dr. Helveston completed a questionnaire that was prepared by Gossett's attorney. Dr. Helveston indicated (in response to a series of yes or no questions) that "the lack of more abnormal visual

acuity, more abnormal eye deviation or other objective findings" would not cause him to disbelieve Gossett's complaints regarding her subjective symptoms of eye fatigue, pain, double vision, headache, and nausea. Dr. Helveston also indicated (also in response to yes or no questions) that there was an "interactive effect between [Gossett's] physical and mental impairment which result [sic] in [her] experiencing a greater level of disability than one would expect from the physical or mental impairment alone" and that that could explain Gossett's "apparent marked functional limitation." *Id.* at 221–22. Helveston further indicated that Gossett's ophthalmological and psychological diagnoses could reasonably be expected to produce pain, fatigue, shortness of breath and other subjective symptomatology at the intensity she alleged, and that he had relied on Gossett's subjective complaints in arriving at his course of treatment for her. *Id.* at 222–23. Finally, Dr. Helveston indicated that Gossett was not disabled based on objective medical findings, but that to the extent her subjective complaints were fully credited she was disabled and that he believed Gossett's description of her subjective symptoms to be "valid." *Id.* at 223. In a letter to Gossett's attorney accompanying the questionnaire, Dr. Helveston stated that:

> From the questions you ask, it appears that you have a very clear understanding of Mary Gossett's problems. As reflected by my answers, I am of the opinion that this women [sic] has a real disability. Either component, the psychological-emotional or the physical extraocular muscle imbalance combined with myopia would be a big load to bear. Combined they seem to overwhelm Mrs. Gossett.

*Id.* at 220.

Dr. Ellis, Dr. Helveston's partner, completed the same questionnaire. Dr. Ellis agreed that the lack of more abnormal visual acuity, more abnormal eye deviation or other objective findings would not cause him to disbelieve Gossett's complaints regarding her subjective symptoms of eye fatigue, pain, double vision, headache, and nausea. *Id.* at 283. He declined to answer any questions regarding Gossett's mental impairments, but

did indicate that the combined effects of mental and physical impairments "could explain" Gossett's functional limitations. *Id.* at 284. Dr. Ellis agreed with Dr. Helveston that Gossett's ophthalmological diagnoses could reasonably be expected to produce the type and intensity of pain and other symptoms of which Gossett complains. *Id.* In response to the question of whether Gossett's description of her symptoms were "valid," Dr. Ellis wrote in "cannot quantify." *Id.* at 285.

The record also contains a report from ophthalmologist Derek Sprunger, who examined Gossett on December 30, 1991. *Id.* at 289–90. Dr. Sprunger diagnosed Gossett with exotropia, small left hypertropia, and high myopia. He noted that an MRI performed in September 1991, in response to Gossett's complaints of vertigo, was normal. Dr. Sprunger also noted that "Gossett reports severe eye fatigue when one eye is covered even for an extended period of time. Based on this I have no explanation for her continued eye fatigue." *Id.* at 290.

### C. *Evidence Regarding Other Physical Impairments*

In addition to her ophthalmological problems, Gossett testified at her first hearing that she was experiencing an impairment of her bilateral manual dexterity. The Appeals Council remanded her case to the ALJ for further development of the record regarding this complaint. To that end, Gossett was evaluated by Dr. Rahman Pourmand, a specialist in muscle disease, on March 15, 1993. Dr. Pourmand reported that Gossett had been reading medical textbooks and "has become convinced that she has myotonic dystrophy." *Id.* at 371. However tests, including a muscle biopsy, were normal, as was her general neurological exam. Dr. Pourmand's general impression was of chronic fatigue, depression, and possible somatization disorder. *Id.* at 373. He recommended that Gossett be seen at the Chronic Fatigue Clinic for further evaluation.

On May 6, 1993, Gossett was seen by Dr. Robyn Goshorn for an evaluation of her fatigue. *Id.* at 357. Dr. Goshorn's impression was depression, fatigue, and multiple somatic

complaints, probably due to depression. She could offer no new therapeutic options to treat Gossett's complaints and recommended that she follow up with her psychiatrist, Dr. Woodham. *Id.* at 359.

### D. *Medical Evidence Regarding Psychological Impairments*

Gossett has been treated by Dr. Gregory Woodham, a psychiatrist, since September 1984. *Id.* at 241. Dr. Woodham has diagnosed Gossett as suffering from dysthymia (chronic depression) and avoidant personality. *Id.* In a letter to Canada Life Assurance Company dated February 19, 1990, Dr. Woodham reported that Gossett was taking 100 mg. per day of Aventyl and had unsuccessfully tried taking Prozac. *Id.* at 280. Dr. Woodham reported that he saw Gossett in "supportive psychotherapy depending on her life circumstances every one to two months." *Id.* He described her depression as "medically stable" and noted that her symptoms included easy fatiguability, anxiety, and withdrawal. Dr. Woodham opined that Gossett's prognosis in returning to work was "not particularly good," noting that "[w]ork is stressful to her." *Id.*

Apparently Gossett's condition had not changed by the next year, as Dr. Woodham sent the identical letter to Canada Life on February 19, 1991. *Id.* at 274. Also in February 1991, Dr. Woodham completed a Psychiatric Work Function Impairment Form, on which he noted that Gossett had limited to moderate ability to perform various work functions, including maintaining a work pace, performing complex or varied tasks, and accepting responsibility for direction, control, and planning, and a "very limited" ability to relate to other people beyond giving and receiving instruction, due to her avoidant personality.

In a Report on Psychiatric Status dated September 10, 1991, Dr. Woodham reported the same diagnoses, adding that Gossett was taking both Aventyl and Prozac and as a result her mood was stable. *Id.* at 242. Dr. Woodham opined that Gossett could attend to simple repetitive tasks for two hour periods depending on eye use required. He also noted that Gossett had not experienced any episodes of decompensation or deterioration in a work setting. *Id.* at 245.

Dr. Woodham also completed a questionnaire prepared by Gossett's attorney on September 10, 1991. Dr. Woodham indicated that he did not find any "clinical evidence to support a psychological basis for [Gossett's] pain." *Id.* at 235. However, he further noted that "the total functional restriction resulting from mental and physical impairments, in combination, [may] be greater than the sum of the parts" and that explained Gossett's "apparent marked functional limitation." *Id.* at 235–36. He also indicated that Gossett's "personality and chronic depression suggest that she perceives a greater level of pain and disability than one would expect from that of another person suffering the same physical findings but who was free of depression and other personality disorders." *Id.* at 236. Finally, he agreed that Gossett's "ability to deal with work stresses on a sustained basis and in a competitive placement is highly questionable in light of the interactive effect between [her] physical and mental impairment." *Id.* at 237.

Gossett also underwent a psychological evaluation by Dr. Robin Hikida, a neuropsychologist, on June 6, 1990. Dr. Hikida administered a Minnesota Multiphasic Personality Inventory (MMPI) and determined that Gossett was extremely introverted and prone to overreacting to minor stress. Dr. Hikida concluded that

> personality variables, including unassertiveness coupled with feelings of ambivalence about her job, appear to be contributing to her persistent visual symptoms. At the same time, from a psychological perspective, she appears capable of increasing her working hours. A likely barrier to her return to work is that Mrs. Gossett's current employment goals do not appear to be in line with those of her employer.

*Id.* at 195.

### E. *Vocational Expert's Testimony*

The ALJ submitted interrogatories to vocational expert Thomas Roundtree (Roundtree) in which he asked several hypothetical questions regarding an individual of Gossett's

age, education, and experience with the "sole impairment" of "the need to avoid work that requires extensive and sustained use of near vision, such as reading." *Id.* at 300. Roundtree opined that such an individual could not perform Gossett's past work, but could perform numerous other types of jobs present in the state economy. *Id.* at 306.

Roundtree appeared at a supplemental hearing and was cross-examined by Gossett's attorney. At counsel's request, Roundtree reviewed Gossett's medical records. He was then asked about an individual with the limitation included in the ALJ's hypothetical, as well as impaired ability to perform postural functions such as climbing, sitting, and standing, limitations in her ability to deal with work stresses, limited ability to related to others, difficulty working continuously for six hours per day or maintaining attention for two continuous hours, and decreased bilateral manual dexterity. Roundtree opined that there were no jobs that such an individual would be able to perform. *Id.* at 115. Roundtree elaborated that the inability to work six hours per day, the inability to maintain attention for a two hour period, impaired ability to perform postural functions, and impairment of bilateral manual dexterity would each, standing alone, preclude employment. *Id.* at 115–17.

## III. *STANDARD OF REVIEW*

In reviewing the final decision of the Commissioner, this court must accept as conclusive the findings of fact made by the Commissioner if such findings are supported by substantial evidence. 42 U.S.C. § 405(g) (1991); *Ray v. Bowen,* 843 F.2d 998, 1001 (7th Cir.1988). Substantial evidence is "that quantum of evidence which 'a reasonable mind might accept as adequate to support a conclusion.'" *Angevine v. Sullivan,* 881 F.2d 519, 521 (7th Cir.1989) (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971)). If the record contains such support, the court must affirm the decision of the Commissioner unless she has made an error of law. *Veal v. Bowen,* 833 F.2d 693, 696 (7th Cir.1987). This court will not reweigh the evidence presented to the ALJ, nor will it make an inde-

pendent determination of whether Gossett is disabled. *See Young v. Secretary of Health & Human Servs.,* 957 F.2d 386, 389 (7th Cir.1992). However, the court will not rubber stamp the decision of the Commissioner, but will critically review the evidence as a whole. *Arbogast v. Bowen,* 860 F.2d 1400 (7th Cir.1988).

A claimant must establish both her disability and her insured status to be eligible for SSI. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months...." 42 U.S.C. § 416(i)(1). *See also,* 42 U.S.C. § 423(d)(1)(A). "Period of disability" is defined as "a continuous period ... during which an individual was under a disability ... but only if such period is of not less than five full calendar months' duration or such individual was entitled to benefits under section 423 of this title for one or more months in such period." 42 U.S.C. § 416(i)(2)(A).

Pursuant to statutory authority, 42 U.S.C. § 423(d)(4), the Commissioner has promulgated regulations for determining whether an individual is disabled. *See* 20 C.F.R. § 404.1520(a)–(f) (1990). The Commissioner employs a five-step process to determine whether a claimant is eligible for benefits within the meaning of the Act. *Campbell v. Shalala,* 988 F.2d 741 (7th Cir.1993). The Seventh Circuit has described this sequential inquiry as follows:

(1) whether the claimant is currently employed; (2) whether he or she has a severe impairment; (3) whether his or her impairment meets or equals one listed by the [Commissioner]; (4) whether the claimant can perform his or her past work; and (5) whether the claimant is capable of performing any work in the national economy. *Schroeter v. Sullivan,* 977 F.2d 391, 393 (7th Cir.1992). Once the claimant has satisfied steps one and two, he or she will automatically be found disabled if he or she suffers from a listed impairment. If the claimant does not have a listed impairment but cannot perform his or her past

work, the burden shifts to the [Commissioner] to show that the claimant can perform some other job. *Rhoderick v. Heckler,* 737 F.2d 714, 715 (7th Cir.1984).

*Campbell,* 988 F.2d at 743. *See also, Young,* 957 F.2d at 389; 20 C.F.R. §§ 404.1520, 416.920.

The ·regulations promulgated under the Act also address the issue of residual functional capacity:

> Your residual functional capacity is what you can still do despite your limitations. If you have more than one impairment, we will consider all of your impairments of which we are aware.... [D]escriptions and observations, when used, must be considered with the rest of your medical record to enable us to decide to what extent your impairment keeps you from performing particular work activities. This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment. Then ... your vocational background is considered along with your residual functional capacity in arriving at a disability decision.

20 C.F.R. § 404.1545.

## IV. *DISCUSSION*

■ Gossett argues that the ALJ's decision is riddled with errors of law and that it is not supported by substantial evidence. It is not necessary to address each of Gossett's legal arguments, as the court finds that the ALJ's determination regarding Gossett's residual functional capacity is not supported by substantial evidence and therefore this cause must be remanded to the Commissioner for a de novo determination.[1]

Gossett claims that the combination of her ophthalmological problems and her mental impairments render her disabled. As set forth in some detail above, there is ample evidence in the record, consisting of reports from her treating physicians, a psychiatrist and two ophthalmologists, and a consulting psychologist, in which they opine that Gossett's subjective ophthalmological symptoms are worsened by her·depression and inability to deal with stress. The ALJ determined that these opinions were entitled to "no consideration" because they were expressed in response to leading questions on a questionnaire prepared by Gossett's attorney.[2] *Id.* at 25, 27.

■ The nature of social security proceedings is such that the use of questionnaires with "leading questions" is often 'the most efficient manner in which to provide the Commissioner with the necessary medical information from a claimant's treating physician. If the ALJ found the questionnaires inadequate because they consisted of leading questions, the Social Security Regulations placed an affirmative duty on him to seek clarification or elaboration from the physicians who completed them. 20 C.F.R. § 404.1512(e)(1) provides:

> We will seek additional evidence or clarification from your medical source when the report from your medical source ... does not contain all the necessary information.... We may do this by requesting copies of your medical source's records, a new report, or a more detailed report from your medical source, including your treating source, or by telephoning your medical source.

Thus, the ALJ was not entitled to ignore the opinions expressed in the questionnaires altogether and dismiss out of hand Gossett's claim that she is disabled by her ophthalmological symptoms as exacerbated by her susceptibility to stress.[3] Nevertheless, this is

---

1. *This decision addresses the substance of each of Gossett's arguments except those regarding the ALJ's treatment of the vocational expert's testimony and whether the ALJ properly followed the Appeals Council's instructions after remand. These issues need not be addressed in light of the remand of this cause for a de novo determination.*

2. Note that there is evidence of the interrelationship between Gossett's mental impairments and ophthalmological problems other than the questionnaires the ALJ found objectionable.

3. The ALJ concludes that Dr. Woodham, Gossett's treating ·psychiatrist, does not support her "theory of disability" because the ALJ believes his responses in Exhibit 23, a Report of Psychiatric Status, "indicate the exact opposite relation-

precisely what the ALJ did. *See id.* at 30 ("[I]t is clear that [Gossett's] theory on this alleged causal link is just that, theory, and is unsupported by objective medical findings, or any of her treating physicians.").

The ALJ also noted that Dr. Helveston's questionnaire responses were "markedly inconsistent" with his earlier statements in Exhibit 34, pages 7 and 8, his May 1989 report to Canada Life. The ALJ does not explain what inconsistencies he found in the two reports; while Dr. Helveston did indicate his belief (in response to a yes or no question) that Gossett could perform jobs other than her own regular occupation, he also noted under the "remarks" section that "Mary is having significant and disabling visual symptoms." *Id.* at 282. If the ALJ found Dr. Helveston's reports to conflict with one another, he had a duty to contact Dr. Helveston for clarification as provided in 20 C.F.R. § 404.1512(e)(1).

The ALJ also determined that Gossett was not a credible witness and therefore he did not consider her subjective claims of eye pain, headaches, and nausea in arriving at her residual functional capacity. This court generally will defer to the ALJ's credibility determination unless it is "patently wrong in view of the cold record." *Pope v. Shalala,* 998 F.2d 473, 486 (7th Cir.1993). However, an ALJ must provide a "'minimal level of articulation' of his reasons for finding lack of credibility." *McGee v. Bowen,* 647 F.Supp. 1238, 1246 (N.D.Ill.1986) (quoting *Zblewski v. Schweiker,* 732 F.2d 75, 79 (7th Cir.1984)). Further, a reviewing court has more latitude in reviewing credibility determinations "'when such determinations rest on objective factors or fundamental implausibilities rather

than subjective considerations.'" *Yousif v. Chater,* 901 F.Supp. 1377, 1384 (N.D.Ill.1995) (quoting *Herron v. Shalala,* 19 F.3d 329, 335 (7th Cir.1994)).

The reason the ALJ provided for disbelieving Gossett's testimony is:

It must be remembered that [Gossett] is not a disinterested witness. To the contrary, she has a direct and substantial monetary interest in the outcome of this case and her testimony must be recognized for what it is—self-serving. Simply stated, if [Gossett's] subjective allegations of disability are accepted at face value, she receives a continuing and substantial monetary benefit in the form of disability payments.

Record at 29. This is simply not an adequate articulated reason for a finding of lack of credibility, as it would be equally applicable to ALL social security claimants. The ALJ also noted that

[Gossett] alleged severe myopia of 20/800, but testified that she was able to attend to daily activities around the home without her glasses. She alleged severe eye pain when she uses her glasses "too much" and also when she reads without her glasses. She did not explain how she has been able to work for the period of time that she has and also attend to daily activities around the home without her glasses in the presence of the alleged eye pain and fatigue.

*Id.* at 30. This statement is not supported by the record and therefore cannot support the ALJ's credibility determination. Dr. Helveston, Gossett's treating physician, confirms her testimony that her vision without

---

ship, e.g. [sic] that her visual difficulties cause her alleged mental impairment." *Id.* at 25. The ALJ draws this conclusion from the fact that in response to the question "Can this person attend to a simple repetitive task continuously for a two hour period of time?" Dr. Woodham responded "depends on use of eyes." *Id.* at 25. The court is at a loss to understand the ALJ's determination that from this answer "it is clear that the claimant's alleged mental impairment is directly related to her allegations of eye dysfunction"; .the answer implies no more than that Gossett's mental impairments alone would not be sufficient to prohibit her from performing a repetitive task for two hours, but that her ophthalmo-

logical problems may be. This interpretation is dictated by the remainder of Dr. Woodham's response to that question, which includes no mention of Gossett's mental impairments or any cause and effect relationship between them and her eye problems: "Eyes would get tired → leading to headaches and ↓ function the next day." *Id.* at 245.

Further, this type of "chicken or the egg" analysis is irrelevant. It does not matter whether Gossett's eye troubles make her stress and depression worse or whether her eye symptoms are exacerbated by stress. The only relevant question is whether the combination of the two impairments renders Gossett disabled.

glasses is 20/800. *Id.* at 282. Gossett explained at her hearing and also in her disability report how her daily activities are affected by her eye impairments. *Id.* at 256–61. For example, she explained that she must stop and rest her eyes several times during a trip to the grocery store, and then rest for twenty to thirty minutes upon returning home. *Id.* at 257–58. She also explained how she cleans in two stages, first doing "what I judge to be a normally adequate job" without her glasses, and then putting her glasses on to be sure she has not missed any dirt. *Id.* at 259. In other words, Gossett has consistently reported that she does her household chores very slowly, and with frequent breaks to rest her eyes. Her ability to perform these activities in this manner is not inconsistent with her alleged inability to perform the demands of a job. As for the ALJ's statement that she did not explain "how she was able to work for the period of time she did" in light of her subjective complaints, the court is unclear as to what "period of time" the ALJ means; the record indicates that shortly after Gossett's current problems began in 1988 she went on disability leave from work, returning only for an unsuccessful part-time trial period.

 Finally, because it will likely be relevant on remand, the court notes that the ALJ applied an incorrect legal standard in making his determination that, regardless of credibility considerations, Gossett's subjective complaints of pain could not support a finding of disability because they were not supported by objective medical evidence. The ALJ stated:

> Initially, therefore, the Administrative Law Judge cannot credit a claimant's subjective symptoms, including pain unless (1) the objective medical evidence documents the existence of a physical or mental impairment that could produce the pain or other subjective symptoms alleged; and (2) the physical or mental impairment could reasonably be expected to cause pain or other subjective symptoms to the nature and degree of severity alleged by the claimant.

*Id.* at 31. The second prong of this standard outlined by the ALJ was expressly rejected by the Seventh Circuit in *Pope,* 998 F.2d at 486, in favor of the standard outlined in 20 C.F.R. § 404.1529(c)(2), which expressly provides that "we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statement." The appropriate standard, as set out in *Pope* is:

> (1) For pain or other symptoms to contribute to a finding of disability, an individual must first establish, by medical signs and laboratory findings, the presence of a medically determinable physical or mental impairment which could reasonably be expected to produce the pain or other symptoms alleged; and (2) once such an impairment is established, allegations about the intensity and persistence of pain or other symptoms must be considered in addition to the medical signs and laboratory findings in evaluating the impairment and the extent to which it may affect the individual's capacity for work.

*Pope,* 998 F.2d at 481. The "allegations about the intensity and persistence of pain" are to be evaluated by considering:

> the claimant's prior work record and information and observations by treating and examining physicians and third parties, regarding such matters as:
>
> 1. The nature, location, onset, duration, frequency, radiation, and intensity of pain;
>
> 2. Precipitating and aggravating factors (e.g., movement, activity, and environmental conditions);
>
> 3. Type, dosage, effectiveness, and adverse side-effects of any pain medication;
>
> 4. Treatment, other than medication, for relief of pain;
>
> 5. Functional restrictions; and
>
> 6. The claimant's daily activities.

*Id.* at 485 (citing Social Security Ruling 88–13). This is the standard that should be followed on remand.

## V. CONCLUSION

For the reasons set forth above, the court determines that the decision of the ALJ is not supported by substantial evidence. Accordingly, this cause is **REMANDED** for further proceedings, including submission of new or updated medical evidence by Gossett if she desires, and a de novo determination by the Commissioner.

**ENTERED** this 23 day of September 1996.